SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 42

---

THE PEOPLE OF THE STATE OF NEW YORK    : AFFIRMATION

          -against-                                   :

Andres Byran-estrada                                    : Indictment No. 06241/07

          Defendant.                                   :

---

    Eric S. Williams, Esq., an attorney duly admitted to practice law, affirms under a penalty of perjury that:

    1. I am associated with Steve Banks, Esq., the attorney of record for the defendant Andres Byran-estrada. I am familiar with the facts of this case and make this affirmation in support of defendant's motion.

    2. This affirmation is made in support of defendant's motions and for such other relief as may be appropriate.

    3. Unless otherwise specified, all allegations of fact are based upon inspection of the record of this case or upon conversations with Assistant District Attorneys, defendant, and counsel's own investigation.

    4. The defendant is charged with Criminal Contempt in the Second Degree, P.L. 215.50(3), and Criminal Contempt in the Second Degree, P.L. 215.50(3).

    5. Mr. Byran-estrada was arrested on November 25, 2007 and was arraigned in Supreme Court on January 16, 2008.

## I. MOTION TO INSPECT GRAND JURY MINUTES, DISMISS THE INDICTMENT, OR IN THE ALTERNATIVE REDUCE TO LESSER-INCLUDED CHARGES

    6. Mr. Byran-estrada respectfully requests that this Court inspect the Grand Jury

)

minutes and dismiss the indictment, or in the alternative, reduce the charges therein to less-included charges, pursuant to Article 210 of the Criminal Procedure Law, on the grounds that the evidence before the Grand Jury was legally insufficient to establish the commission of the charges or any lesser-included offense.

7. Pursuant to CPL § 210.20(1), the defendant further requests that this Court dismiss the indictment upon inspection of the Grand Jury minutes if the Court determines that:

(a) the indictment or any count thereof is defective, within the meaning of CPL § 210.25.

(b) the evidence before the Grand Jury was not legally sufficient to establish any of the offenses charged or any lesser-included offense.

©) the Grand Jury proceeding was defective, within the meaning of CPL § 210.35.

(d) the indictment does not conform to the requirements of CPL § 200.50 regarding form and content.

(e) the indictment does not conform to the requirements of Article 190 of the Criminal Procedure Law as to:

(I) the rules of evidence, and

(ii) the legal instructions or charge by the Assistant District Attorney, or the lack of such necessary legal instructions or charge as required by law.

(f) there exists some other jurisdictional or legal impediment to the conviction of the defendant for the offenses charged

8. Alternatively, the defense further requests that this Court reduce any and all counts of the indictment pursuant to CPL § 210.20(1-a).

## II. MOTION TO RELEASE GRAND JURY MINUTES

9. Pursuant to CPL § 210.30, Mr. Byran estrada requests that this Court release the Grand Jury minutes in its entirety to defense counsel.

10. This Court has the authority to release the Grand Jury minutes after it has read them so as to enable defense counsel to provide the Court with concise and accurate oral arguments in connection with this motion to dismiss or reduce the charges. Mr. Byran-estrada also requests that this Court permit defense counsel to examine the charges given to the Grand Jury.

## MOTION TO COMPEL DISCOVERY

11. Attached to and made a part of this Omnibus Motion the defendant's Demand to Produce pursuant to C.P.L. §240.

12. Should the prosecution within fifteen (15) days of the filing of the Demand to Produce, fail to respond in writing or, without justification or good cause, does not comply or only complies in part with defendant's demand to produce, defendant moves in advance for an order compelling disclosure of the information requested. See C.P.L. §240.35, §240.40(1) and §240.70.

13. All of the information requested in the Demand to Produce is material and essential to the adequate preparation of a defense and to avoid unnecessary delay at trial. The information is within the knowledge and control of the District Attorney's office and/or its witnesses. Moreover, the production of these materials would not place an unreasonable burden on the District Attorney's office. And importantly, the defense cannot obtain the requested information or property through any other means.

## MOTION TO COMPEL A BILL OF PARTICULARS

14. Attached to and made a part of this Motion is the defendant's Request for a Bill of Particulars pursuant to C.P.L. §§ 200.95(5) and 100.45.

15. Should the prosecution fail, without justification or good cause, to comply, in whole or in part, to the Request for a Bill of Particulars, defendant moves in advance for an order compelling disclosure of the information requested. See C.P.L. §§200.95(5) and 100.45.

16. All of the information requested in the request for a Bill of Particulars is necessary and essential to the preparation of the defense and to avoid delay once trial begins. The defendant and defense counsel have no independent means of obtaining precise information as to the claims advanced by the District Attorney. In addition, the complaint contains only vague and conclusory allegations. The complaint, therefore, does not contain any of the particulars requested and, as a result, lacks the specificity necessary to inform Mr. Byran-estrada of the exact nature of the charges.

17. Moreover, none of the requested particulars are evidentiary in nature, nor will they reveal <u>how</u> the prosecution intends to prove the alleged facts.

18. The defendant is requesting only that the prosecution reveal what facts it intends to prove at trial. The accusatory instrument does not adequately inform defense counsel of the factual basis underlying the conclusory allegations of the crimes charged. Defendant demands and is entitled to be informed of the specific facts underlying each element of each of the crimes charged. <u>People v. Iannone</u>, 45 N.Y.2d 589 (1978).

19. Consequently, the defense requests that this court order the prosecution to reveal the factual information requested in the attached Bill of Particulars.

## PRECLUSION AS RELIEF FOR FAILURE TO COMPLY WITH DISCOVERY DEMANDS AND THE REQUEST FOR A BILL OF PARTICULARS

20. Should the prosecution fail to timely serve written refusal to comply with the Demand to Produce and Request for a Bill of Particulars setting forth the grounds for its refusal, or if the court is satisfied that the prosecution has not shown good cause or justification for such refusal, the court must order the prosecution's compliance with defendant's requests. See C.P.L. §240.40(1) and §200.95(5).

21. In the event that the prosecution fails to comply with a court ordered Demand to Produce and/or the Request for a Bill of Particulars, the defense moves in advance for an order precluding the District Attorney from calling any witness or introducing any evidence related to the information sought in the Demand to Produce and/or Request for a Bill of Particulars. See C.P.L. §§200.95(5) and 240.70(1).

## MOTION TO PRECLUDE THE OFFERING OF EVIDENCE

22. The prosecution is required to give the defendant notice of intent to offer evidence of statement or identification testimony within 15 days of arraignment, pursuant to C.P.L. § 710.30. The defendant requests that any testimony concerning statement or identification for which proper notice has not been given be precluded, pursuant to C.P.L. § 710.30(3). See also People v. O'Dohimty, 70 N.Y.2d 479 (1987); People v. Baughton, 70 N.Y.2d 854 (1987).

## SANDOVAL MOTION

23. The defendant moves to preclude the prosecution from using at trial evidence of defendant's prior criminal convictions, all underlying bad acts, and all prior uncharged criminal, vicious, or immoral conduct.

9

24. The defendant intends to testify in this manner.

25. The defendant, therefore, moves to preclude the District Attorney from cross-examining the defendant at trial on any of the defendant's prior arrests or any uncharged criminal, vicious, or immoral conduct that the prosecution may be aware of. See People v. Sandoval, 34 N.Y.2d 371 (1974); C.P.L. §240.43.

26. The defendant's prior arrests and bad acts should be suppressed because their use on cross-examination would have no purpose other than to show that defendant has a propensity to commit crimes and, therefore, is likely to have committed the crimes charged in the accusatory instrument. People v. Schwartzman, 24 N.Y.2d 241(1969); People v. Shields, 58 A.D.2d 94 (1977), aff'd, 46 N.Y.2d 764 (1978).

## RESERVATION OF RIGHTS

The defendant respectfully requests the right to make any and all further motions as may be necessary based upon information and disclosures which may result from the granting of requests made in this motion. People v. Frigenti, 91 Misc.2d 139 (N.Y. Supp. 1977); C.P.L. §255.20(3).

The defendant reserves the right to be prosecuted only pursuant to legally sufficient misdemeanor information. Mr. Byran-estrada does not waive that right by filing this motion. People v. Weinberg, 34 N.Y.2d 429 (1974).

WHEREFORE, the affiant respectfully requests this Court to grant the relief sought herein and reserve to defendant the right to amend or supplement this motion for

such other and further relief as this Court may deem just and proper.

DATED:      NEW YORK, NEW YORK
            January 30, 2008

Eric S. Williams, Esq.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 42

---

THE PEOPLE OF THE STATE OF NEW YORK    : DEMAND TO PRODUCE

-against-                                                        :

Andres Byran-estrada ,                              : Indictment No. 06241/07

Defendant.                                      :

---

TO:    HON. ROBERT MORGENTHAU
        DISTRICT ATTORNEY OF NEW YORK COUNTY
        ASSISTANT DISTRICT ATTORNEY ASSIGNED

Pursuant to C.P.L. §240.20, demand is hereby made that you supply or make available to be undersigned the following:

1. All arguably relevant statements, admissions, and confessions, whether or not the People to intend to offer them on their direct case, in the possession of the prosecution or about which, by the exercise of due diligence, the prosecution could have knowledge, made by the defendant to any other person, which have in any way been recorded or summarized in writing. The exact time, date and location each statement, admission, and confession was made, and the names and addresses of all those present when each statement, admission, and confession was made, and to whom it was made;

2. Any written report or document, or portion thereof, concerning a physical or mental examination, or scientific test or experiment, relating to the criminal action or proceeding which was made by, or at the request or direction of a public servant engaged in law enforcement activity, or which was made by a person whom the prosecution intends to call as a witness at trial, or which the People intend to introduce at trial;

3. Any photograph or drawing relating to the criminal action or proceeding which was made or completed by a public servant engaged in law enforcement activity, or at the

request or direction of a public servant engaged in law enforcement activity, or which was made by a person whom the prosecutor intends to call as a witness at trial, or which the People intend to introduce at trial, including, but not limited to:

4. Disclosure of the existence of any item of a character described in paragraphs two and three, or which the People are aware and/or have in its possession, but which have a source other than a public servant engaged in law enforcement or person acting by his request, direction, etc.;

5. Any tapes or other electronic recordings including 911 tape, radio communications, and Sprint tapes which the prosecutor intends to introduce at trial for any purpose, irrespective of whether such recording was made during the course of the criminal transaction;

6. Any communication received by any law enforcement agency, regardless of its form, relating to the incident for which defendant was arrested. Indicate the form and weapon of the communication, the names and addresses of those who supplied the information, and the date, time, place and to whom such information was given.

7. The date, time and place of the offense charged, and of the arrest of the defendant;

8. The date, time and place that the defendant was taken into custody, if that information differs from that demanded in paragraph 7;

9. Provide the names, shield numbers and command of all law enforcement officers involved in the investigation of this case and/or arrest of the defendant. State which, if any, of these officers were on special assignments regarding this case. Explain the nature of such special assignments (i.e., undercover, "ghost,", etc.).

10. A list and description of, and an opportunity to inspect, all property obtained from defendant, including, but not limited to prerecorded buy money or contraband.

11. A list and description of, and an opportunity to inspect, all property which the People intend to introduce against the defendant at trial;

12. State whether there exist any co-conspirators or accomplice to crimes recited in the complaint, whether mentioned herein or not; and if so, their names and address or places of incarceration, and the Indictment numbers and current status of their cases. State whether and why any co-conspirators or accomplices have not been arrested and/or charged with the alleged crimes;

13. State whether any person(s) referred to in paragraph 12 made any statement to any law enforcement official, or persons acting in concert with same, with reference to the complaint herein, the existence of which statement is, or by the exercise of due diligence could be, known to the District Attorney. Provide the substance of such statements;

14. State whether any witness for the prosecution was taking and/or to any degree was under the influence of alcohol and/or drugs at or near the time of the alleged crimes; if so, what was the type and amount of the alcohol and/or drug. If the drug was prescribed by a doctor, what was the name and address of the doctor;

15. State whether any person who the people intend to call as a witness has been subjected to hypnosis or other externally induced form of memory recall;

16. State whether the District Attorney has reason to believe that any witness will not be available because of death, physical disability, mental infirmity, lengthy or permanent absence from the jurisdiction, inability to locate, or any other reason which would preclude the presence of the witness at any future proceeding relating to the present complaint;

17.  Please state what, if any, audio or visual aids were used by any law enforcement personnel or agents thereof to view/record the defendant's conduct which is the subject of this information (i.e., binoculars with manufacturer, model and power, audio tape recorder, etc.).

18.  All item seized from the person of, or in close proximity to, the defendant at the time of his arrest or subsequent to it.  State exactly from where, when and by whom each item was seized and the circumstances of each seizure;

19.  The exact date, time and specific location of any and all searches of any premises, vehicles or other place that defendant owned, rented, visited or in which he had a proprietary.

20.  The name, shield numbers and commands of all law enforcement officials and the names and addresses of all civilians present during any search or seizure referred to in paragraphs 18 and 19 whether or not the District Attorney intends to call them as witnesses;

21.  State whether the defendant was advised of his constitutional rights at any time; if so, by whom, where, and how he was so advised;

22.  Copies of any waiver of his constitutional rights that defendant signed;

23.  Anything required to be disclosed, prior to the trial, to the defendant by the prosecutor, pursuant to the Constitution of the United States or the State of New York;

24.  Furnish defendant, now and on a continuing basis, all evidence, material, and information known to the prosecutor, or which by due diligence could be learned from other government agents or prospective witnesses in the case, which may tend to exculpate the defendant, either by indication of innocence or by potential impeachment of a prosecution witness, within the meaning of Brady v. Maryland, 373 U.S. 83 (1963);

People v. Rosario, 9 N.Y. 2d 286 (1961); and People v. Wright, 74 Misc. 2d 419 (1973), including, but not limited to:

      a. Any and all police reports made in connection with this criminal action or proceeding, including, but not limited to, the Arrest Report (PD244-146), the Complaint Report (PD313-152), the Complaint Follow-Up Report (PD313-018), the Patrolman's Log (PD112-147), the Sprint Report, the Accident and Aided Card, Daily Activity Report, Buy Report, etc., and any property vouchers.

      b. State the names, addresses (for attorney only) and dates of birth, if civilians, or shield numbers and commands, if law enforcement agents, of all witnesses to the alleged incident and/or the defendant's arrest. State whether the People intend to call each witness to testify at trial.

      c. State whether any of the civilian witnesses that the People intend to call at trial have criminal, psychiatric and/or drug/alcohol abuse histories. If so, provide details, including NYSID Sheets.

      d. State whether there are any deals, understandings, agreements and/or promises between the prosecution and any other individual as to the nature and extent of prosecution, sentence type or length, as required by Giglio v. United States, 405 U.S. 150.

All the foregoing requests (pars.1-24), are not limited to items which the prosecutor intends to offer into evidence, but rather include all tangible material within the possession, custody, and control of the prosecution, which may be material to the preparation of a defense.

DEMAND is further made that the refusal to supply any of the demanded material be made in writing setting forth the grounds for such refusal and that a copy of such

writing be served upon the undersigned and filed with the Court within fifteen (15) days from receipt by you of this Demand.


DATED:      New York, NEW YORK
            January 30, 2008

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 42

---

THE PEOPLE OF THE STATE OF NEW YORK          : REQUEST FOR A BILL
                                                OF PARTICULARS
                        -against-             : Indictment No. 06241/07

Andres Byran-estrada,
                        Defendant.            :

---

TO:    HON. ROBERT MORGENTHAU
       DISTRICT ATTORNEY OF NEW YORK COUNTY
       ASSISTANT DISTRICT ATTORNEY ASSIGNED

        The defendant has been charged, under Indictment Number 06241/07, with

Criminal Contempt in the Second Degree, P.L. 215.50(3), and Criminal Contempt in the

Second Degree, P.L. 215.50(3). He has entered a plea of "Not Guilty."

        In order for the defendant to properly defend against the charges in the indictment

it is necessary and essential to the defense that the specific items of factual information not

recited in the information, including the substance of defendant's conduct, be supplied to

defense counsel. This is made particularly necessary because the accusatory instrument,

heretofore presented, with regard to certain material allegations, is lacking in factual detail

and conclusory in nature, and because no preliminary hearing was held. Pursuant to

C.P.L. §200.95 a "Request for a Bill of Particulars" is hereby made requesting the

following :

        1. The date, time and location the defendant allegedly committed the counts in the

information.

        2. The date, time and location of the arrest of the defendant.

        3. The date, time and location that defendant was identified as the perpetrator of

the alleged crime.

4. The specific acts allegedly attributable to the defendant in the information

~~which make him guilty of Criminal Contempt in the 2nd Degree, §215.50(3).~~

5. With respect to the count of Criminal Contempt in the 2nd Degree, set forth with particularity::

    a. What order the defendant is said to have disobeyed.

    b. The date that order was issued.

    c. The date the order expired, or, if not, what date it is to expire.

    d. What actions taken by the defendant does the prosecution intend to prove violated the Order of Protection.

    e. How the defendant was aware that the Order of Protection had been issued.

6. The time and place at which the defendant is alleged to have committed the crime if different from the time and place of his seizure and arrest.

7. State whether the People intend to prove that defendant acted as a principle or accomplice or both. If the People intend to prove that defendant acted with another, provide the following:

    a.    The name(s), address(es), place(s) of incarceration, and dates of birth of any persons who allegedly acting in concert with the defendant in committing the crimes charged;

    b.    The specific acts attributable to those who allegedly acted in concert with defendant;

    c.    The property of every nature and description taken from the person of, or in the immediate proximity of, any accomplice or other principal to the alleged crimes. State exactly from where such property was seized. Included in this request is the Indictment number and/or indictment number and the

name of defendant in any companion or related case;

    d.    State whether and why any individual who allegedly acted in concert with the defendant has not been arrested and/or has not been charged with his participation in the crimes charged.

8. The property of every nature and description taken from the person of, or in immediate proximity of, the defendant and co-defendant. State exactly from where and by whom such property was seized and whether seized pursuant to a warrant. Also state the location at which each seizure took place;

9. The names, addresses and shield numbers of all law enforcement officials who participated in the arrest of defendant; either prior, during or subsequent to the arrest; including, but not limited to: undercover, 'ghost,', etc.

10. Request is further made that any refusal to supply any of the requested material be made in writing stating the reason for refusal and setting forth the grounds for such refusal as fully as possible as required by C.P.L. §200.95, subd. 4. It is requested that a copy of such writing be served upon the undersigned and filed with the court

within fifteen (15) days from receipt by you of this Request for a Bill of Particulars.

DATED:     NEW YORK, NEW YORK
           January 30, 2008

                                        Respectfully yours,
                                        Eric S. Williams, Esq.
                                        Attorney for Defendant
                                        The Legal Aid Society
                                        49 Thomas Street
                                        New York, New York 10013

TO:     ROBERT MORGENTHAU
        District Attorney
        New York County

        ALAN J. MURPHY
        Clerk, Supreme Court
        New York County

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 42

PART 42· FEB 2 8 2008

---

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ANDRES BRYAN-ESTRADA,

Defendant.

AFFIRMATION IN RESPONSE
TO THE DEFENDANT'S
OMNIBUS MOTION

Indictment No. 06241/2007

---

Matthew Galluzzo, an attorney admitted to practice before the Courts of this State, affirms under penalty of perjury that:

1.    I am the Assistant District Attorney in New York County assigned to this case and am familiar with its facts.

2.    This affirmation is submitted in response to the defendant's omnibus motion in which the defendant seeks inspection of the Grand Jury minutes and the dismissal of the indictment, a bill of particulars, pretrial discovery, suppression of statements, suppression of identification testimony, suppression of physical evidence, a Sandoval hearing, and in support of the People's request for reciprocal discovery.

### PEOPLE'S RESPONSE TO THE DEFENDANT'S MOTION TO INSPECT THE GRAND JURY MINUTES AND TO DISMISS THE INDICTMENT

3.    The People consent to the Court's in camera review of the Grand Jury minutes. Inspection will reveal that the evidence before the Grand Jury amply supports the offense(s) charged, that the Grand Jury was properly instructed on the law, and that the integrity of the proceedings was unimpaired. The People deny all allegations to the contrary and oppose disclosure of the Grand Jury minutes to the defense. The issues raised in the defendant's motion are straightforward, and disclosure is not necessary to their resolution. CPL §210.30(3).

PEOPLE'S RESPONSE TO THE DEFENDANT'S
REQUEST FOR A BILL OF PARTICULARS

4.    The facts set forth in the indictment, which was previously served upon defendant, provide all the particulars to which the defendant is entitled. See CPL §200.95. They specify "the substance of defendant's conduct ... which the People intend to prove at trial on their direct case ...." The other information requested is evidentiary detail beyond the scope of a bill of particulars. See, People v. Davis, 41 N.Y.2d 678, 680 (1977) ("[a] bill of particulars serves to clarify the pleading; it is not a discovery device"). Accordingly, defendant's motion for further particulars should be denied.

PEOPLE'S RESPONSE TO THE DEFENDANT'S
MOTION FOR PRETRIAL DISCOVERY

5.    The Voluntary Disclosure Form ("VDF") provides all of the pretrial discovery to which the defendant is entitled.  As explained more fully below, the other items the defendant seeks are not discoverable. See, People v. Colavito, 87 N.Y.2d 423, 427 (1996) (items not enumerated in CPL §240 are not discoverable as a matter of right unless constitutionally or otherwise specially mandated); See, Matter of Constantine v. Leto, 77 N.Y.2d 975 (1991); Matter of Miller v. Schwartz, 72 N.Y.2d 869, 870 (1988) (discovery matters are "regulated by statute"; thus where a defendant has no statutory right to pretrial discovery, the defendant request should be denied).

6.    The defendant seeks statements that the defendant made to persons other than law enforcement officials or their agents.    Such statements and information related to them are not discoverable. See CPL §240.20(1)(a).

7.    The defendant requests prior statements of the People's witnesses.  These statements are not discoverable at this time.  See People v. Allen, 108 A.D.2d 601, 602 (1st Dept. 1985) ("[t]here is no requirement that the People furnish Rosario material to a defendant prior to commencement of trial").

2

They will be provided to the defendant to the extent and at the time prescribed by law. See CPL §§240.44(1) and 240.45(1)(a).

8.    The defendant requests numerous police reports.    These reports are not discoverable at this time. See CPL §§240.20 and 240.45.

9.    The defendant requests the personnel files of potential police witnesses.    These files are not discoverable absent a showing of "some factual predicate which would make it reasonably likely" that the files contain impeachment material.   See People v. Gissendanner, 48 N.Y.2d 543, 550 (1979); Civil Rights Law §50a. No such showing has been made in this case.

10.    The defendant requests information regarding potential police witnesses and their investigative activities.    This information is beyond the scope of pretrial discovery.

11.    The defendant requests the names and addresses of the People's non-police witnesses.    A witness list is not discoverable under CPL §240.20 and is not "other property" under CPL §240.40.

12.    The defendant requests the dates of birth and/or criminal records of the People's non-police witnesses. These materials are also not discoverable at this time and will be provided as prescribed by law. See CPL §§240.44(2) (3) and 240.45(1) (b) (c).

13.    The defendant requests evidence tending to impeach the People's non-police witnesses. Mere impeachment evidence is not the proper subject of pretrial discovery. See CPL §§240.20, 240.40.

14.    The defendant requests exculpatory material within the meaning of Brady v. Maryland, 373 U.S. 83 (1963).    The People are aware of their continuing duty under Brady to disclose exculpatory evidence to the defense and will honor that obligation.

3

PART 42 [JAN 8 0 2008]

SUPREME COURT OF THE STATE OF NEW YORK UNIT
COUNTY OF NEW YORK: PART 42

2008 JAN 30  AM 6: 21

THE PEOPLE OF THE STATE OF NEW YORK  :  NOTICE OF OMNIBUS
                                           DISTRICT … YORK … MOTION
                 -against-                 NEW YORK COUN

Andres Byran-estrada                       : Indictment No. 06241/07

                 Defendant.                :

PERSONS:

        PLEASE TAKE NOTICE, that upon the annexed affirmation of Eric S. Williams,

Esq., an attorney duly admitted to practice law, the annexed exhibits and the prior

proceedings herein, the undersigned will move this Court at Part 42, on January 30, 2008

at 9:30 A.M., or as soon thereafter as counsel can be heard for an order:

        1.  Inspection of the Grand Jury minutes by the Court, pursuant to CPL § 210.30
(1) and (2), Dismissal of the indictment, pursuant to CPL  §§ 210.20, 210.30, 210.35 on
the grounds that the evidence presented to the grand jury was legally insufficient to
support the charges contained in the indictment, the grand jury proceeding was defective,
or in the alternative, Reduction, pursuant to CPL § 210.20 (1-a), of the charges contained
in the indictment to lesser included offenses, in the event that the evidence presented to
the grand jury was not legally sufficient to establish the greater charges but sufficed to
establish those lesser included offenses.

        2.  Motion to Release Grand Jury Minutes.

        3.  Compelling Discovery pursuant to C.P.L. §240.40.

        4.  Compelling a Bill of Particulars pursuant to C.P.L. §§200.95(5) and 100.45.

        5.  Precluding the use of certain evidence for failure to comply with the Discovery
Demand and Request for a Bill of Particulars.  C.P.L. §200.95(5); C.P.L. §240.70(1).

        8.  Precluding the prosecution from introducing evidence of statement or
identification evidence at trial.  C.P.L. §710.30(3).

        9.  Precluding at trial the use of the defendant's prior criminal history or prior
uncharged criminal, vicious, or immoral conduct.

        10.  Reserving to defendant the right to make additional motions as necessary.

21

And for such other relief as this Court may deem just and proper.

DATED:  NEW YORK, NEW YORK
         January 30, 2008

YOURS, etc.

TO:    ROBERT MORGNTHAU
       District Attorney
       New York County

Steve Banks, Esq.
Attorney for the Defendant
The Legal Aid Society
49 Thomas Street
New York, New York 10013

       ALAN J. MURPHY
       Clerk, Supreme Court
       New York County

Eric S. Williams, Esq.
of Counsel
(212) 298-5260



49 Thomas Street, New York, N.Y. 10013 Tel: (212) 732-5000 Fax: (212) 964-0591 – www.legal-aid.org

*Theodore A. Levine*
*President*

*Steve Banks*
*Attorney-in-Chief*

*Criminal Appeals*
*Bureau*
*Seymour W. James, Jr.*
*Attorney-in-Charge*

*New York County Office*
*Irwin Shaw*
*Attorney-in-Charge*

## FACSIMILE COVER SHEET

TO:  Arthur S. Friedman                    FAX #: (212) 686-0252
FROM: Anju Alexander                       TEL. #: (212) 298-5225
DATED: 02/10/09

*******************************
FAX NUMBER (212) 298-5251
*******************************

COMMENTS:   Re.:  People v. Andres Bryan - Dkt.: 2009NY008744

TOTAL PAGES: 8
(including cover sheet)

CONFIDENTIAL NOTE: This facsimile is intended only for the person or entity to which it is addressed and may contain information that is privileged, confidential, or otherwise protected from disclosure. Dissemination, distribution, copying of this facsimile or the information herein by anyone other than the intended recipient is prohibited. If you have received this facsimile in error, please notify us immediately by telephone and return the facsimile by mail.

23



49 Thomas Street, New York, N.Y. 10013 Tel: (212) 732-5000 Fax: (212) 964-0591 – www.legal-aid.org

2009 FEB -5 PM 4: 15

*Theodore A. Levine*
*President*

*Steve Banks*
*Attorney-in-Chief*

*Criminal Appeals*
*Bureau*
*Seymour W. James, Jr.*
*Attorney-in-Charge*

*New York County Office*
*Irwin Shaw*
*Attorney-in-Charge*

## NOTICE OF DEFENDANT'S INTENTION TO
## TESTIFY BEFORE GRAND JURY

February 5, 2009

Honorable Robert Morgenthau
District Attorney
1 Hogan Place
New York, N.Y. 10012

Re.: <u>People v. Andres Bryan</u>
Docket No.:   2009NY008744

Sir or Madam:

Pursuant to C.P.L. § 190.50(5), please take notice that my client intends to testify before any Grand Jury consider charges against him/her.

Please contact me sufficiently in advance of your Grand Jury presentation to enable me to arrange my client's appearance on the scheduled date. In the even that my client is incarcerated, I do not waive his/her appearance nor do I consent to an extension of any statutorily imposed time limitations on his/her production before the Grand Jury for the purpose of testifying.

Finally, to the extent that you intend to cross-examine my client in the Grand Jury about prior criminal, vicious or immoral acts, be advised that I will seek an order limiting your right to do so from the Grand Jury judge. Similarly, if you have not yet supplied me with a complete notice of my notice of my client's statements made to law enforcement personnel pursuant to C.P.L. § 710.30, I will be moving before the Grand Jury judge for such disclosure prior to my client's appearance in the Grand Jury.

Sincerely,

Anju Alexander
Staff Attorney
(212) 298-5225

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

Page 2 of 2

| THE PEOPLE OF THE STATE OF NEW YORK | FAMILY OFFENSE |
| -against- | DEFENDANT/VICTIM |
| | RELATIONSHIP: |
| 1. Andres Bryan-estrada (M-48) | DOMESTIC PARTNER FORMERLY LIVING TOGETHER |
| 823958 | |
| Defendant. | FELONY |
| | ADA GALLUZZO |

Deponent states (i) that the above actions by defendant are in violation of an order of protection issued on November 15, 2007 by Judge Evelyn Laporte, docket number 2007NY085216 , and which remains in effect until December 20, 2007, (ii) that the order of protection directs the defendant to refrain from communication with Morsima Reyes by mail, telephone, or via third parties, and (iii) that defendant is aware of the order of protection in that defendant was present in court when the court order was issued.

False statements made herein are punishable as a class A misdemeanor pursuant to section 210.45 of the penal law.

_____
Deponent

12 | 6 | 07        1710
Date and Time

ACT 5 Version 4.2.9 Created on 12/06/07 4:46 PM

20.    More than 30 days have elapsed since the defendant pleaded not guilty to the indictment and the defendant has not served notice of an intention to present psychiatric evidence at trial. Accordingly, the defendant should be precluded from presenting such evidence. See, CPL §250.10(2).

Wherefore, it is respectfully requested that, except as consented to herein, the defendant's motion should be denied.

Respectfully submitted,

Matthew Galluzzo
Assistant District Attorney
(212) 335-3985

Dated:          New York, New York
                February 25, 2008

5

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ANDRES BRYAN-ESTRADA,

Defendant.

AFFIRMATION IN RESPONSE TO THE DEFENDANT'S
OMNIBUS MOTION

Indictment NO. 06241/2007

Robert M. Morgenthau
District Attorney
New York County
One Hogan Place
New York, New York 10013
(212) 335-9000

27

# Criminal Court of the City of New York

### New York County
### Misdemeanor Complaint

**M**

**MISDEMEANOR**

The People of the State of New York
vs.
**Defendant:**
1.   ANDRES BRYAN (M 49)
     M09609995 1/31/2009 14:04
     625 WEST 156 ST APT 1A
     MANHATTAN NY 10032

**Charges:**
PL120.00(1)

**2009NY008744**

|‖‖‖|‖‖|‖‖|‖‖‖|

2.

3.

4.

Interpreter:  Language _____          Screener: Cheng, Wesley - Trial Bureau 40

---

**Notices Served at Arraignment:**
- ☐ CPL 710.30(1)(A) - Statement
- ☐ CPL 710.30(1)(B) - Identification
- ☐ CPL 250.20 - Alibi
- ☐ PL 450.10(48 hrs /15 days) - Property
- ☐ CPL 170.20 – Grand Jury
- ☐ Cross Grand Jury
- ☐ OTHER: _____

**Documents:**                    **Needed For**
**Served at Arraignment:**        **Conversion**
- ☐ Supporting Deposition          ☐
- ☐ DMV Abstract                   ☐
- ☐ Lab Report/ Field Test         ☐
- ☐ DWI Paperwork                  ☐
- ☐ Domestic Incident Report
- ☐ Family Registry
- ☐ Underlying T.O.P.              ☐

**Disposition:**
- ☐ ACD – CPL 170.55
- ☐ ACD – CPL 170.56
- ☐ Waives Prosecution by Information
     and Pleads Guilty to
     PL 240.20/ _____
- ☐ Investigation & Sentenced Ordered
- ☐ DNA–Eligible Misdemeanor
- ☐ DNA Sample Taken

**Adjournment:**

Part: _____    Date: _____

**Bail Condition:**

_____ / _____
(Ins. Co. Bail Bond)        (Cash Bail)
- ☐ ART 730 Exam Ordered
- ☐ Protective Custody
- ☐ Medical Attention
- ☐ Psychiatric Evaluation
- ☐ Suicide Watch
- ☐ Deemed an Information
     Defense Motions Due:

- ☐ T.O.P./ F.O.P.

**Sentence (or Promise):**
_____ days jail
Conditional Discharge:
_____ Days Community Service
_____ Days Jail Alternative
Other: _____
Mandatory Surcharge (and CVA):

- ☐ Judgment Entered – All Fees
- ☐ $200 Misd. ☐ $120 Viol. ☐ $80 VTL*
- ☐ $395 VTL1192 Misd.* ☐ $255 VTL1192(1) Infrac.*
*(For offenses on or after August 1, 2008)
- ☐ $50 - DNA Fee

---

Arresting Officer                    Court Reporter          Date          Part
033 Precinct21482Simon Urena

**Judge** _____

CRC 3195 (8/08)

28

CRIMINAL COURT OF THE CITY OF NEW YORK
COUNTY OF NEW YORK

Page 1 of 2

THE PEOPLE OF THE STATE OF NEW YORK
-against-

1. Andres Bryan-estrada (M 48)


823958

Defendant.

FAMILY OFFENSE
DEFENDANT/VICTIM
RELATIONSHIP:
DOMESTIC PARTNER FORMERLY
LIVING TOGETHER.

FELONY
ADA GALLUZZO

Detective Chad Vazquez, shield 06656 of the 033 Detective Squad, states as follows:

On November 25, 2007, at about 08:00 hours West 177th Street in the County and State of New York, the Defendant committed the offenses of:

1.  PL215.00      Bribing a Witness
                  (1 count)
2.  PL215.50(3)   Criminal Contempt in the Second Degree
                  (1 count)

the defendant conferred, offered, and agreed to offer a benefit upon a witness or person about to be called as a witness in a action upon an understanding that the testimony of such witness would thereby be influenced or that such witness would avoid appearing or testifying at such action; and the defendant engaged in intentional disobedience to the lawful mandate of a court in other than a labor dispute.

The offenses were committed under the following circumstances:.

Deponent states that deponent is informed by Moraima Reyes, of an address known to the District Attorney's Office, that on November 25, 2007, informant received a telephone call from a mutual friend of defendant and Reyes, and said person told Reyes that defendant was sorry for assaulting Reyes, and that defendant would pay for her medical bills if she discontinued her cooperation with the prosecution of defendant.

Deponent states that deponent is informed that an indictment charging defendant with Rape in the First Degree and Assault in the Second Degree has been filed in New York Supreme Court, that said case is pending in Part 70 of New York Supreme Court on December 20, 2007, and that the indictment charges defendant with having committed these crimes against Moraima Reyes.

29

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

~~[redacted]~~            -against-

ANDRES BRYAN-ESTRADA,

                              Defendant.

THE GRAND JURY OF THE COUNTY OF NEW YORK, by this indictment, accuse the defendant of the crime of **CRIMINAL CONTEMPT IN THE SECOND DEGREE**, in violation of Penal Law §215.50(3), committed as follows: *A Misdemeanor*

The defendant, in the County of New York, on or about November 13, 2007, intentionally disobeyed and resisted the lawful process and other mandate of a court, to wit, an order of protection.

SECOND COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuse the defendant of the crime of **CRIMINAL CONTEMPT IN THE SECOND DEGREE**, in violation of Penal Law §215.50(3), committed as follows: *A Misdemeanor*

The defendant, in the County of New York, on or about November 25, 2007, intentionally disobeyed and resisted the lawful process and other mandate of a court, to wit, an order of protection.

ROBERT M. MORGENTHAU
District Attorney

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

ANDRES BRYAN-ESTRADA,

Defendant.

PEOPLE'S VOLUNTARY
DISCLOSURE FORM

Docket No.    2007NY091398

The People of the State of New York hereby voluntarily disclose to the defendant the
following factual information pertaining to the above-captioned case:

A.    **BILL OF PARTICULARS**

1.    OCCURRENCE

Date:        November 13, 2007
App. Time:    10:53 am
Place:        telephone

Date:        November 25, 2007
App. Time:    6:38 pm
Place:        telephone in Manhattan

2.    ARREST

Date:        December 6, 2007
App. Time:    10:35 am
Place:        625 West 156th Street

B.    **NOTICES**

1.    STATEMENTS

☐ If checked, notice is hereby served, pursuant to CPL §710.30(1)(a), that the People
intend to offer at trial evidence of a statement made by defendant to a public servant.
*(Where a statement has been video taped, counsel should contact the assigned Assistant
District Attorney to arrange a mutually convenient time for viewing the tape or should
provide a blank tape for copying.)*

31

TE  01-31-09                                                    PAGE  2
1E  BRYAN ANDRES              NYSID  4985200Z    TRAN NO  06320L

```
              < < < < < < CRIMINAL HISTORY > > > > > >
```

| ARREST INFORMATION | ARREST/ARRAIGNMENT CHARGES | DISPOSITION AND RELATED DATA | |
|---|---|---|---|
| | CLASS B FEL          NCIC 1103 | | |
| | SX ABUSE:CONTCT-FORCBL COMPLSN | THE FOLLOWING CHARGE(S): UNLAWFUL IMPRISONMENT 2ND | |
| | PL   130.65     SUB 01 | PL   135.05        NO SUB | |
| | CLASS D FEL          NCIC 1117 | CLASS A MISD        NCIC 1008 | |
| | ASSAULT ON NON-PARTIC DUR FELY | | |
| | PL   120.05     SUB 06 | | |
| | CLASS D FEL          NCIC 1399 | 11-19-07  NY CO SUP CRT CASE # 05863-2007 | |
| | MENACING-2ND:WEAPON | INITIAL REPORT OF DOCKET | |
| | PL   120.14     SUB 01 | NUMBER | |
| | CLASS A MISD         NCIC 1316 | | |
| | ASLT W/INT CAUSES PHYS INJURY | | |
| | PL   120.00     SUB 01 | 12-20-07  NY CO SUP CRT | |
| | CLASS A MISD         NCIC 1399 | CASE # 05863-2007 | |
| | | ARRAIGNED | |
| DT/PL 12-06-07 | - - ARREST - - | - - DISPOSITION - - | |
| D 33 | CRIM CONTEMPT-2ND:DISOBEY CRT | 12-06-07  CRIM COURT NEW YORK | |
| | PL   215.50     SUB 03 | CASE # 2007NY091398 | |
| DATE: 11-25-07 | CLASS A MISD         NCIC 5005 | INITIAL REPORT OF DOCKET | |
| E PLACE: | | NUMBER | |
| D 33 | - - ARRAIGNMENT - - | | |
| /AGY M077047171 | | | |
| D. PCT 033 | BRIBING A WITNESS | 12-06-07  CRIM COURT NEW YORK | |
| | PL   215.00     NO SUB | CASE # 2007NY091398 | |
| CONF 59705117N | CLASS D FEL          NCIC 5102 | ARRAIGNED | |
| NO)   M084292 | CRIM CONTEMPT-2ND:DISOBEY CRT | | |
| | PL   215.50     SUB 03 | | |
| | CLASS A MISD         NCIC 5005 | 01-16-08  NY CO SUP CRT CASE # 06241-2007 | |
| | | ARRAIGNED | |
| JLENT FELONY | - - ARREST - - | NO DISPOSITION REPORTED | |
| )T/PL 01-31-09 | ASLT W/INT CAUSE PH INJ W/WEAP | | |
| ) 33 | PL   120.05     SUB 02 | COURT OF ARRAIGNMENT: | |
| | CLASS D FEL          NCIC 1399 | CRIM COURT NEW YORK | |
| )ATE: 01-31-09 | | | |
| E PLACE: | | | |
| ) 33 | | | |

  NEXT PAGE)

2

```
E    01-31-09                                                          PAGE     3
E    BRYAN, ANDRES                        NYSID  4985200Z   TRAN NO  0632OL
```

```
           < < < < < < < CRIMINAL HISTORY > > > > > > >
-------------------------------------------------------------------------
    ARREST      |  ARREST/ARRAIGNMENT CHARGES  |      DISPOSITION AND    |
 :INFORMATION   |                              |       RELATED DATA      |
-------------------------------------------------------------------------
#/AGY M096099995|                              |
PD PCT 033      |                              |
                |                              |
 CON# 63392190R |                              |
                |                              |
NO     M009111  |                              |
-------------------------------------------------------------------------
          < < < < < < < OTHER INFORMATION > > > > > > >
-------------------------------------------------------------------------
:ST UPDATED PERSONAL DESCRIPTORS:   EYES/BROWN    HAIR/BLACK    WGT 180 LBS
-------------------------------------------------------------------------
: FINGERPRINT CLASSIFICATION   12111111101110090805
-------------------------------------------------------------------------
,INFO! JULY 02, 1959
-------------------------------------------------------------------------
 INFO! CUBA              | DOMINICAN REPUBLIC
-------------------------------------------------------------------------
 AND! REPORTED ON   |       INFORMATION
RESS!--------------------------------------------------------------------
  IDEC   01, 1982| ESTRADA, ANDRE
  !            125 3B     ERICCSM     ST    CORONA              NEW YORK
  INOV   10, 2007| BRYAN ESTRADA, ANDRES
  IDEC   06, 2007| BRYAN ESTRADA, ANDRES
  IJAN   31, 2009| BRYAN, ANDRES E
  |           1625     WEST 156 STR      MANHATTAN          NEW YORK
-------------------------------------------------------------------------
```

RE AN INDIVIDUAL IS SENTENCED JUNE 1, 1981, OR LATER, ON MORE THAN ONE
RGE WITHIN A DOCKET, THE SENTENCES MAY BE CONSIDERED TO BE CONCURRENT.
ESS IDENTIFIED AS CONSECUTIVE.

DOMESTIC CASE' BANNER ON THE RAPSHEET INDICATES THAT A NEW YORK STATE
ESTIC INCIDENT REPORT WAS COMPLETED FOR THIS CASE.

E ABOVE RESPONSE TO YOUR UPDATED FINGERPRINT CARD SUBMISSION IS BASED
IN A FINGERPRINT IDENTIFICATION.

   ALL ENTRIES ARE AS COMPLETE AS THE DATA FURNISHED TO DCJS.
              DENISE E. O'DONNELL, COMMISSIONER

Case 1:10-cv-05640-ARR-LB   Document 1-3   Filed 12/06/10   Page 34 of 125 PageID #: 40

```
SPONDED TO:
TE   01-31-09                    STATE OF NEW YORK              TRAN NO    06320L
ME   1530           DIVISION OF CRIMINAL JUSTICE SERVICES       PAGE       1
X NO M009111
    CONFIDENTIAL TO:        NYCPD HDQ                           DOB 07-02-59
ENCY ID NO M09609995        1 POLICE PLAZA, RM 1100A            RAC HISPANIC
                            NEW YORK        NY                  SEX MALE
    €013001N                              10038-1403            HGT 5-08
                                                                SOC
                                                                FBI 587052AA7
AME  BRYAN, ANDRES                    I   INYSID  49852002 I    III NYS ONLY

EST:                    01-31-09   14:04    ELAPSED TIME (HRS:MINS)
GINAL RECEIVED:         01-31-09   15:22        001:18
PRODUCED:               01-31-09   15:30        000:08
                    NAMES USED BY SUBJECT                   €ADULT ARREST
(AN, ANDRES E                                   ESTRADA, ANDRE
AN ESTRADA, ANDRES
```

< < < < < < CRIMINAL HISTORY > > > > > > >

| ARREST INFORMATION | ARREST/ARRAIGNMENT CHARGES | DISPOSITION AND RELATED DATA |
|---|---|---|
| DT/PL 12-01-82<br>NS<br><br>DATE: 12-01-82<br>E PLACE:<br>YORK<br><br>/AGY  11224060<br>D PCT 112<br><br>CON# 08037096Y<br><br>NO     Q023579 | - - ARREST - -<br>POSSESSION STOLEN PROPERTY-3RD<br>PL  165.40        NO SUB<br>CLASS A MISD      NCIC 2804 | DISPOSITION -<br>01-24-83  CRIM CRT QUEENS<br>CASE # 2Q028029<br>CONVICTED UPON PLEA OF GUILTY<br><br>THE FOLLOWING CHARGE(S)<br>ATTEMPTED CPSP-3<br>PL   110/165.40      NO SUB<br>CLASS B MISD         NCIC 2804<br>SENT: CONDITIONAL DISCHARGE<br>FINE:     $100  FINE PAID |
| DT/PL 11-10-07<br>D 33<br><br>DATE: 11-09-07<br>E PLACE:<br>D 33<br><br>/AGY M07697417<br>D PCT 033<br><br>CON# 59633363H<br><br>NO    M078632 | - - ARREST - -<br>MENACING-2ND: WEAPON<br>PL   120.14       SUB 01<br>CLASS A MISD      NCIC 1316<br><br>ASLT W/INT CAUSES PHYS INJURY<br>PL   120.00       SUB 01<br>CLASS A MISD      NCIC 1399<br><br>UNLAWFUL IMPRISONMENT 2ND<br>PL   135.05       NO SUB<br>CLASS A MISD      NCIC 1008<br><br>- - ARRAIGNMENT - -<br><br>RAPE-1ST: FORCIBLE COMPULSION<br>PL   130.35       SUB 01 | - - DISPOSITION -<br>* * * DOMESTIC CASE * * *<br>11-10-07  CRIM COURT NEW YORK<br>CASE # 2007NY085216<br>INITIAL REPORT OF DOCKET<br>NUMBER<br><br><br>11-10-07  CRIM COURT NEW YORK<br>CASE # 2007NY085216<br>ARRAIGNED<br><br><br>11-15-07  CRIM COURT NEW YORK<br>CASE # UNKNOWN<br>NOT ARRAIGNED |

Γ. NEXT PAGE)

34

2.    IDENTIFICATION

    ☐ If checked, notice is hereby served, pursuant to CPL §710.30(1)(b), that the People intend to offer at trial testimony regarding an observation of defendant either at the time or place of the commission of the offense or upon some other occasion relevant to the indictment, to be given by a witness who has previously identified defendant.

C.    **DISCOVERY**

1.    ADDITIONAL STATEMENTS

    ☐ If checked, the People hereby disclose written, oral or recorded statements of a defendant or of a co-defendant to be jointly tried, made, other than in the course of the criminal transaction, to a public servant engaged in law enforcement activity or to a person then acting under his direction or in cooperation with him, and which statements are not given in section B(1) above. C.P.L. §240.20(1)(a).

2.    GRAND JURY TESTIMONY

    ☒ If checked, defendant or a co-defendant to be tried jointly testified before the Grand Jury relating to this criminal action. C.P.L. §240.20(1)(b). *Such testimony is available upon payment of a stenographic fee.*

3.    SCIENTIFIC AND MEDICAL REPORTS

    ☐ If checked, the People hereby disclose written reports or documents or portions thereof, concerning a physical or mental examination or scientific test or experiment, relating to this criminal action, which were made by, or at the request or direction of a public servant engaged in law enforcement, or by a person whom the People intend to call as a witness of a trial, or which the People intend to introduce at trial. C.P.L. §240.20(1)(c).

4.    PHOTOGRAPHS AND DRAWINGS

    ☒ If checked, there exists photographs or drawings relating to this criminal action which were made or completed by a public servant engaged in law enforcement, or which were made by a person whom the People intend to call as a witness at trial, or which the People intend to introduce at trial. C.P.L. §240.20(1)(d). *(Counsel should contact the assigned Assistant District Attorney to arrange a mutually convenient time to examine this material.)*

5.    <u>INSPECTION OF PROPERTY</u>

☐ If checked, there exist photographs, photocopies or other reproductions made by or at the direction of a police officer, peace officer or prosecutor of property prior to its release pursuant to the provisions of Penal Law Section 450.10, irrespective of whether the People intend to introduce at trial the property or the photograph, photocopy or other reproduction. C.P.L. §240.20(1)(e). *(Counsel should contact the assigned Assistant District Attorney to arrange a mutually convenient time to examine this property.)*

6.    <u>OTHER PROPERTY</u>

☐ If checked, there exists other property obtained from the defendant, or a co-defendant to be tried jointly, C.P.L. §240.20(1)(f), or from another source. *(Counsel should contact the assigned Assistant District Attorney to arrange a mutually convenient time to examine this property.)*

7.    <u>TAPES AND ELECTRONIC RECORDINGS</u>

☒ If checked, there exist tapes or other electronic recordings which the People intend to introduce at trial, irrespective of whether such recording was made during the course of the criminal transaction. C.P.L. §240.20(1)(g). *(Counsel should contact the assigned Assistant District Attorney to arrange a mutually convenient time to listen to the tapes or provide a blank tape for copying.)*

8.    <u>BRADY MATERIAL</u>

☐ If checked, there is material appended which the People are required to turn over pursuant to the United States or the New York State Constitution. The People are aware of their continuing obligation to disclose material exculpatory information to defendant and intend to satisfy that obligation as required by law. C.P.L. §240.20(1)(h).

9.    <u>COMPUTER OFFENSES</u>

☐ If checked, discovery is hereby served pursuant to C.P.L. §240.20(1)(j) of the time, place and manner of notice given pursuant to Penal Law §156.00(6), which governs offenses for Unauthorized Use of a Computer (Penal Law §156.05) and Computer Trespass (Penal Law §156.10).

10.    <u>POLICE OFFICERS INVOLVED</u>

The following are some of the officers who were involved in the arrest or police investigation.

| <u>Name</u> | <u>Shield</u> | <u>Command</u> |
|---|---|---|
| Detective Chad Vazquez | 6656 | 33rd Detective Squad |

3

11.    SEARCH WARRANTS

☐ If checked, a search warrant was executed during the investigation of this case.

**D.    DEMAND FOR NOTICE OF ALIBI**

Pursuant to CPL §250.20, the People hereby demand that defendant supply the District Attorney with (a) the place or places where the defendant claims to have been at the time of the commission of the crime(s) and (b) the names, residential addresses, places of employment and addresses thereof of every alibi witness upon whom defendant intends to rely to establish his presence elsewhere than at the scene of the crime at the time of its commission. Within a reasonable time after the receipt of the information specified above, the District Attorney will submit a list of any rebuttal witnesses, their addresses, and employers.

**E.    RECIPROCAL DISCOVERY**

Pursuant to CPL §240.30(1), the People hereby demand that defendant supply the District Attorney with (a) any written report or document, or portion thereof, concerning a physical or mental examination, or scientific test, experiment, or comparisons, made by or at the request or direction of the defendant, if the defendant intends to introduce such report or document at trial, or if defendant has filed a notice of intent to proffer psychiatric evidence and such report or document which relates thereto or if such report or document was made by a person other than defendant, whom defendant intends to call as a witness at trial; and (b) any photograph, drawing, tape, or other electronic recording which the defendant intends to introduce at trial.

**NOTE**: Any defense motion or request addressed to the above-captioned case should be directed to the attention of the Assistant District Attorney named below, who is assigned to this case.

Dated:    New York, New York
         December 20, 2007

                              Robert M. Morgenthau
                              District Attorney
                              One Hogan Place
                              New York, NY 10013

By:    Matthew Galluzzo
       Assistant District Attorney
       335-3985

4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  PART 42

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE PEOPLE OF THE STATE OF NEW YORK,

       - against -                      <u>DECISION AND ORDER</u>

ANDREW BRYAN-ESTRADA,              Ind. No. 6241/07

                     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MAXWELL WILEY, J.:

Defendant's omnibus motion is decided as follows:

    1. The motion to inspect the Grand Jury minutes and dismiss or reduce the charges for legal insufficiency of the evidence, inadequate legal instructions or defects in the proceedings is granted to the extent that the People are directed to produce the minutes for the Court's inspection.

    2. The application for release of the Grand Jury minutes is denied.

    3. The motion for discovery and a bill of particulars is granted to the extent provided by the People with leave to defendant to apply to the Court for any additional items unreasonably withheld.

    4. The motions to preclude identification testimony and evidence concerning statements for the failure to provide CPL 710.30 notice are moot. The People have stated that they do not plan to introduce the testimony of any witness who previously identified the defendant, and do not plan to offer on their direct case any statements made by defendant to law enforcement officials.

    5. The People are reminded of their continuing duty to supply all <u>Brady</u> material.

    6. The defense is directed to respond to the prosecutor's demand for reciprocal discovery.

    7. The <u>Sandoval</u> motion will be heard immediately before trial.

Dated: March, 2008
     New York, New York

                                  _____
                                  MAXWELL WILEY, J.S.C.

PART 42  MAR 0 5 2008

38)

```
1   M E L I S S A              D E M A Y O ,
2            called as a witness, having been first
3            duly sworn, responded to the oath and
4            testified as follows:
5                 THE WITNESS:  Yes.
6   BY MS. HUTTER:
7            Q.    Can you please state your name,
8   employer for the record?
9            A.    Melissa DeMayo and Office of Court
10  Administration.
11           Q.    In particular, what county do you
12  work out of?
13           A.    New York City.
14           Q.    And do you work here in New York
15  County in Manhattan?
16           A.    Yes.
17           Q.    What is your position with the
18  Office of Court Administration?
19           A.    I am a senior court clerk.
20           Q.    How long have you worked for the
21  Office of Court Administration?
22           A.    Six and a half years.
23           Q.    And in your present capacity as a
24  senior court clerk, how long have you been a
25  senior court clerk?
```

JS

DeMayo

1             A.      Two and a half years.

2             Q.      What are, in general, your duties

3        and responsibilities as a senior court clerk?

4             A.      I handle and maintain Criminal

5        Court files.

6             Q.      What is the Office of Court

7        Administration?  What's its function?

8             A.      They employ the court employees of

9        New York State.

10            Q.      As part of the Office of Court

11       Administration, do they oversee Criminal Court

12       cases?

13            A.      Yes.

14            Q.      Would they also receive particular

15       court cases that occur in New York County?

16            A.      Yes.

17            Q.      When a person is arrested and a

18       Criminal Court case begins, are there court

19       papers that will go along with that particular

20       case?

21            A.      Yes.

22            Q.      Can you briefly explain how that

23       process would work when someone is brought

24       before a court to tell -- to be told of

25       criminal charges?

                                                    JS

DeMayo

1           A.    First, they are arraigned.  They

2    are given a copy of the criminal complaint.

3    And then each time they appear in court, the

4    court file contains any papers received by the

5    DA or the defense attorney.

6           Q.    And, in particular, what is kept in

7    a court file?

8           A.    The court action sheet, the

9    charging sheet, which is the complaint, notices

10   of appearances, and any orders of protection,

11   if they are issued.

12          Q.    Now, you talked about a court

13   action sheet.  What is that document, in

14   particular?

15          A.    It's just something that shows each

16   court date and what happens each court date.

17   Who is present, who is absent, and the next

18   court date.

19          Q.    Would it also have indications when

20   an Order of Protection is issued in court?

21          A.    Yes.

22          Q.    And who would be making those types

23   of notations?

24          A.    The judge or clerk.

25          Q.    Now, at the time that someone

JS

DeMayo

1     appears on a criminal case in a court part, are
2     they told of -- if there is another court date?
3           A.    Yes.
4           Q.    Would those notations also be
5     indicated on the court file?
6           A.    Yes.
7           Q.    Where are the records kept that are
8     part of the court file?
9           A.    Criminal Court.  In Criminal Court.
10          Q.    Then if the case gets moved into a
11    different court part, do some of the papers
12    travel to those court parts?
13          A.    Yes, they are held in the back
14    office for each part.
15          Q.    And when someone is indicted, do
16    the files also travel to another court part?
17          A.    Yes.
18          Q.    What is an indictment?
19          A.    They are cases that are heard by
20    the Supreme Court.
21          Q.    So criminal cases can be both heard
22    in Criminal Court or Supreme Court; is that
23    accurate?
24          A.    Yes.
25          Q.    And in both instances there will

DeMayo

1    always be a court file that is maintained

2    regardless if it's Criminal Court or Supreme

3    Court?

4         A.    Yes.

5         Q.    But it might be different papers

6    that have followed each of --

7         A.    There is always a record.  And if

8    our cases are sent to the Supreme Court, we

9    make note of it we sent the cases to Supreme

10   Court.

11        Q.    Now, prior to coming into the grand

12   jury chamber, were you asked to search for --

13   determine if there are any court records with

14   respect to a case against the name Andres

15   Bryan-Estrada?

16        A.    Yes.

17        Q.    And, in particular, is there a

18   court case?

19        A.    Yes.

20        Q.    And what is the docket number

21   assigned to that case?

22        A.    2007NY085216.

23        Q.    What a docket number?

24        A.    It's an identifier for the case.

25        Q.    Is it unique to a particular case?

JS

DeMayo

1              A.      Yes.

2              Q.      So no one case -- would one case

3      only have one docket number?

4              A.      Yes.

5              Q.      That docket number would never be

6      assigned to somebody else's case; is that

7      correct?

8              A.      Right.

9              Q.      At the time we talked about records

10     being made, are you, as a senior court clerk,

11     under a business duty to make those records if

12     you are in court?

13             A.      Yes.

14             Q.      And at the time are you also under

15     a duty to accurately record the information

16     that has occurred in court?

17             A.      Yes.

18             Q.      And the other court clerks, are

19     they under the same business duty?

20             A.      Yes.

21             Q.      Is there a business duty under --

22     for the Office of Court Administration to

23     accurately maintain the records of what has

24     transpired in a courtroom?

25             A.      Yes.

DeMayo

```
 1              Q.    And are those records made at or
 2       near the time the particular event has
 3       happened?
 4              A.    Yes.
 5              Q.    I see you have some documents in
 6       front of you.   What is that?
 7              A.    It's the Criminal Court file for
 8       Andres Bryan-Estrada.
 9              Q.    Can you just hold on one second.   I
10       am sorry.   If you can tell us again what
11       documents you have in front of you?
12              A.    The Criminal Court file for Andres
13       Bryan-Estrada.
14              Q.    Now, it's referring to the docket
15       number you spoke about?
16              A.    Yes.
17              Q.    As part of those records is there a
18       court action sheet?
19              A.    Yes.
20              Q.    Is there also a criminal complaint
21       as part of that?
22              A.    Yes.
23              Q.    And were any Orders of Protection
24       ever issued in this particular case?
25              A.    Yes.
```

JS

MS. HUTTER:  Okay.  At this time I
am going to receive these documents into
evidence as Grand Jury Exhibit No. 1.

Q.    Take a look at the Order of
Protection.  Can you tell the grand jurors when
an Order of Protection was first issued?

A.    The first one was issued on
November 10, 2007.

Q.    What -- look at the court action
sheet.  What occurred on November 10, 2007?

A.    The defendant was arraigned, read
his rights and told the next court date.

Q.    What was the next court date?

A.    November 15, 2007, part F.

Q.    When you indicate part F, that's
where he is supposed to appear, right?

A.    Right.

Q.    Now, looking at the Order of
Protection, on -- that was issued on November
10, 2007, does it have a signature, a stamp of
the judge?

A.    Yes.

Q.    What judge is that?

A.    Honorable Larry RC Steven.

Q.    And what is an Order of Protection?

JS

DeMayo

1     A.     It's a paper, an official paper

2  telling a person to refrain from contacting

3  another person.

4     Q.     In this particular case what

5  conduct was Mr. Bryan-Estrada told to refrain

6  from?

7     A.     He was told to stay away from

8  Moraima, M-O-R-A-I-M-A, Reyes, R-E-Y-E-S.  Her

9  home, school, business, employment, and no

10  contacts through third party, no contact at

11  all.

12     Q.     When was that Order of Protection

13  in effect until?

14     A.     November 15, 2007.

15     Q.     And is there any indication on this

16  Order of Protection that the defendant was told

17  about the order?

18     A.     Yes, he was advised in court.

19     Q.     Now, was -- on November 15, 2007,

20  are there any indications of what occurred in

21  court?

22     A.     He was given another temporary

23  Order of Protection and case was adjourned.

24     Q.     When was it adjourned until?

25     A.     December 20, 2007.

JS

1          Q.    And does it indicate that the --

2     that Andres Bryan-Estrada, the defendant in

3     that matter, appeared on November 15th?

4          A.    Yes, it does.  He was present.

5          Q.    And the Order of Protection, what

6     did that Order of Protection tell Mr. Estrada

7     not to do?

8          A.    It told him to stay away from

9     Moraima Reyes, her home, business, school,

10    employment, and no contact through third

11    parties, no contact at all.

12         Q.    In fact, on both of the Order of

13    Protections, does it also include he needed to

14    refrain from communication or any other contact

15    by mail, telephone, e-mail, voice mail or other

16    means with Miss Reyes?

17         A.    Yes.

18         Q.    And when was that second Order of

19    Protection, the one dated November 15th, when

20    was it in effect until?

21         A.    December 20, 2007.

22         Q.    Does it also indicate if the

23    defendant was told about the issuance of court

24    order?

25         A.    Yes, it does.

DeMayo

1      Q.    Just to be clear, between November

2   10th, which was the first court date that you

3   spoke of, and November 15th, this case, from

4   what you can tell, was still active?

5      A.    Right.

6      Q.    Was still pending in Criminal

7   Court?

8      A.    Yes.

9      Q.    Then on the 15th when it was

10  adjourned until November 20th, the status of

11  the case was -- it was still open?

12     A.    Yes.

13     Q.    It was still pending in a Criminal

14  Court?

15     A.    Yes.

16     Q.    I'm also going to show you

17  specifically Grand Jury Exhibit No. 2 and 3,

18  which are photocopies.  You can just tell me

19  what they are of?

20     A.    They are copies of Orders of

21  Protection that are in the file.

22     Q.    Do those copies both bear the seal

23  of the court?

24     A.    Yes.

25     Q.    Do they also bear a certification

JS

DeMayo

1      by another court clerk?

2                 A.    Yes, they do.

3                       MS. HUTTER:  At this time I'm also

4      going to receive into evidence Grand Jury

5      Exhibit No. 2 and 3.

6                       Just to be clear, Grand Jury

7      Exhibit No. 2 will be the one dated

8      November 10th and Grand Jury Exhibit No.

9      3 will be the one November 15th.

10                      I have no further questions for

11     this witness.  Seeing none from the grand

12     jurors, the witness is excused.

13                      (WITNESS EXCUSED)

14

15

16

17

18

19

20

21

22

23

24

25

JS

```
1                    MS. HUTTER:  At this time I'll call
2           Yudelca Mateo into the grand jury.
3     Y U D E L C A           M A T E O ,
4                    called to act as interpreter,
5                    states as follows:
6                    MS. HUTTER:  It's my understanding
7           you have not appeared before this grand
8           jury?
9                    THE INTERPRETER:  No.
10                   FOREPERSON:  Do you solemnly swear
11          that the answers to the questions to be
12          administered as to your qualifications
13          shall be the truth, so help you God?
14                   THE INTERPRETER:  Yes, I do.
15    BY MS. HUTTER:
16          Q.    Have a seat.  Could you please
17    state your full name for the record?
18          A.    Yes, my name is Yudelca Mateo.
19          Q.    And who are you employed by?
20          A.    By the District Attorney's Office
21    here in Manhattan.
22          Q.    What is your position with the
23    District Attorney's Office?
24          A.    As a Spanish interpreter.
25          Q.    How long have you worked for the
```

JS

Mateo                                                                          16

1    District Attorney's Office?

2           A.    Approximately four years.

3           Q.    Now, prior to coming to the

4    District Attorney's Office, did you ever work

5    as an interpreter?

6           A.    I was a bilingual elementary

7    teacher for Board of Education for

8    approximately five years, at the Department of

9    Probation also as an interpreter.  One of my

10   duties as a probation officer, assistant to the

11   Department of Probation.  When I worked as a

12   case worker for a subcontractor agency from the

13   Administration of Children's Service, one of my

14   duties also was my bilingual clients and my

15   cases, so I also had that duty of interpreting

16   and speaking both languages.

17          Q.    Okay.  What is your educational

18   background?

19          A.    Yes, I have an obtained a Bachelor

20   of Science from John Jay College of Criminal

21   Justice.  Major criminal justice, minor is

22   police science, sociology, halfway through

23   graduate studies in elementary bilingual and

24   special education.

25          Q.    Are you fluent in the English

                                                              JS

Mateo                                      27

1    language?

2         A.    Yes, I am.

3         Q.    Are you also fluent in the Spanish

4    language?

5         A.    Yes, I am.

6         Q.    Have you been trained in the

7    translation from English to Spanish and Spanish

8    to English?

9         A.    Yes, I have.

10         Q.    And besides the background and

11   training you already spoken of, is there

12   anything else?

13         A.    Here the District Attorney's

14   Office.

15         Q.    And have you translated from

16   English to Spanish and Spanish to English on

17   cases before today?

18         A.    Yes, I have.

19         Q.    Have you also previously come into

20   the grand jury as an interpreter?

21         A.    Yes, I have.

22         Q.    Have you been qualified in New York

23   County before other grand juries to interpret

24   English to Spanish and Spanish to English?

25         A.    Yes, I have.

JS

Mateo

1       Q.    Do you know about how many times?

2       A.    Approximately a hundred and sixty

3   times, approximately.

4               MS. HUTTER:  Okay.  Ladies and

5           gentlemen of the grand jury, I hereby

6           qualify Miss Mateo as an expert in the

7           translation of English to Spanish and

8           Spanish to English.  I ask that she be

9           sworn in.

10              FOREPERSON:  Do you solemnly swear

11          that whenever you shall appear before

12          this grand jury to interpret the

13          testimony given by any witness here, you

14          will truthfully and faithfully interpret

15          the testimony of the witness and that you

16          will keep secret all matters before such

17          grand jury within your knowledge, so help

18          you God?

19              THE INTERPRETER:  Yes, I will.

20              FOREPERSON:  Thank you.

21              MS. HUTTER:  Thank you.  Just to

22          let you know that obviously you have an

23          interpreter here.  For those who do know

24          Spanish, you are to abide by her English

25          translation, not by what the witness will

JS

1          say in Spanish 'cause the translation
2          will be the official record.
3                    At this time I am going to call
4          Miss Reyes into the grand jury.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25


JS

Reyes/Mateo

```
 1          M O R A I M A              R E Y E S ,
 2                  called as a witness, having been
 3                  first duly sworn, through the
 4                  interpreter,  Yudelca Mateo,
 5                  responded to the oath and testified
 6                  as follows:
 7                      THE WITNESS:  I swear.
 8      BY MS. HUTTER:
 9          Q.    You may be seated.  Could you
10      please state your full name for the record?
11          A.    Moraima Denonisia Reyes.
12          Q.    What county do you currently live
13      in?
14          A.    In the Bronx.
15          Q.    Miss Reyes, where are you
16      originally from?
17          A.    Dominican Republic.
18          Q.    What did you do for a living in the
19      Dominican Republic?
20          A.    I am an attorney.
21          Q.    At what point did you come to the
22      United States?
23          A.    The first time was January 17,
24      2007, this year 2007.
25          Q.    Did there come a time that you left
```

JS

Reyes/Mateo

1          the United States to go back to the Dominican

2          Republic this year?

3                    A.    Yes.

4                    Q.    About when was that?

5                    A.    In the month of June of this

6          present year.

7                    Q.    Did there come a time that you came

8          back to the United States after being in the

9          Dominican Republic?

10                   A.    Yes.

11                   Q.    About when was that?

12                   A.    Exactly in the month of September.

13                   Q.    Do you know someone by the name of

14         Andres Bryan-Estrada?

15                   A.    Yes.

16                   Q.    Who is he?

17                   A.    He is the person whom I lived with.

18                   Q.    At what point did you start living

19         with him?

20                   A.    At the end of the month of April.

21                   Q.    Did you know him before you came to

22         the United States?

23                   A.    No.

24                   Q.    How did you come to meet him?

25                   A.    We met on Broadway purchasing

                                                              JS

Reyes/Mateo

1    perfumes.

2           Q.    After you met a relationship

3    developed, correct?

4           A.    That's how it is.

5           Q.    You indicated that you lived

6    together.  Where was it that you lived?  What

7    county?

8           A.    The first time that we moved in

9    together was the Bronx.  And on the second

10   occasion five days later we moved to the

11   Manhattan.

12          Q.    Did he come with you to the

13   Dominican Republic when you left?

14          A.    No.

15          Q.    When you came back to the United

16   States, did you again live with Bryan-Estrada?

17          A.    Yes, because he sent for me.

18          Q.    How would you describe the nature

19   of your relationship when you came back from

20   the Dominican Republic?

21          A.    At the beginning it was normal.  At

22   the beginning.

23          Q.    Were you also at some point in the

24   year of 2007, were you planning to get married

25   to him?  I need you to give a verbal answer,

JS

Reyes/Mateo

```
 1          please.
 2                  A.      Yes.
 3                  Q.      I'd like to direct your attention
 4          to November 8, 2007.  Did you and Bryan-Estrada
 5          have an argument that day, yes or no?
 6                  A.      Yes.
 7                  Q.      And where did that argument take
 8          place?
 9                  A.      At the place where we lived.
10                  Q.      Where was that, the address?
11                  A.      In Manhattan at 156th Street.
12          Building number is 625, apartment 1A.
13                  Q.      During the course of that argument,
14          did there come a time that Bryan-Estrada hit
15          you?  Yes or no?
16                  A.      Yes.
17                  Q.      Did there also come a time that
18          night that Bryan-Estrada had sexual intercourse
19          with you without your consent, yes or no?
20                  A.      Yes.
21                  Q.      Did you report the matter to the
22          police on November 9, 2007?
23                  A.      Yes.
24                  Q.      Did you also go to the hospital
25          about that incident?
```

JS

Reyes/Mateo

1          A.     From the precinct they sent me to

2      the hospital.

3          Q.     What type of injuries did you have

4      on November 9th as a result of November 8th?

5          A.     As a result of that damage to me

6      here, I have locations in my eye and something

7      that is -- he did here on the side of this

8      upper face.

9               MS. HUTTER:   Just for the record

10              you are indicating on your left cheek in

11              a semi-circle.  Also had pointed to, I am

12              sorry, your right cheek and had also

13              pointed to your left eye.

14         Q.     With respect to the injuries on

15      your right cheek, were there cuts and open skin

16      areas?

17         A.     Like a scrape.

18         Q.     Like scratches?

19         A.     Yes, but the skin was sort of

20      detached.

21              MS. HUTTER:   Okay.  I want to

22              instruct the grand jurors that you have

23              heard some testimony about an incident

24              that took place on November 8th.  You are

25              not being asked to consider any charges

Reyes/Mateo

1          with respect to that.  We provided it
2          solely for the purpose to provide context
3          to the charges we're asking you to
4          consider, which is bribery and criminal
5          contempt.  And we're giving it to you
6          only as background information.  You are
7          not to use it as any type of propensity
8          evidence towards the defendant.  So it is
9          not affirmative evidence for any other
10         charged crime or any other crime you
11         might think have happened on that date.
12         Okay.
13              Q.    Miss Reyes, after November 9th did
14    there come a time that you came to the District
15    Attorney's Office here in New York County?
16              A.    Yes.
17              Q.    Was that on or about November 14th
18    of 2007?
19              A.    Yes.
20              Q.    Now, before that date of November
21    14, 2007, had you received any phone call from
22    someone about -- where the conversation was
23    about what happened with Bryan-Estrada on
24    November 8th?
25              A.    Yes.

JS

26

Reyes/Mateo

1       Q.    And do you know who called you?

2       A.    Yes.

3       Q.    Who was that called you?

4       A.    A man named Rafael.

5       Q.    How do you know that it was Rafael

6    who called you?

7       A.    Because when he call me he

8    identified himself.

9       Q.    And what was the date that he

10   called you?

11      A.    November 13, 2007, exactly at 10:53

12   at night.

13      Q.    And where did you receive the phone

14   call?  What phone?

15      A.    My cellular phone.

16      Q.    What is your cell phone number?

17      A.    917 327--0714.

18      Q.    When you received this call, did

19   information come up on your cell phone

20   indicating what number the caller was calling

21   from?

22      A.    That's how it is.

23      Q.    What was the number that came up

24      A.    347 787--2186.

25      Q.    Was there also any information with

JS

27

Reyes/Mateo

1   respect to a name?

2        A.    No.

3        Q.    This is no case of a Rafael Amigo

4   Cuba or do you not remember?

5        A.    No.

6        Q.    You said that the caller identified

7   himself.  I am sorry?

8        A.    The information I have written it

9   later on.

10        Q.    So there was some information with

11   respect to a Rafael that appeared on your

12   phone?

13        A.    No, only the number.  Later on I

14   added the name to have reference of which call

15   or from who that call was from.

16        Q.    So you added information indicating

17   that it was Rafael?

18        A.    Exactly.

19        Q.    Okay.  You indicated the person who

20   had called you stated that his name was Rafael.

21   Did he tell you anything else about who he was?

22        A.    Yes.

23        Q.    What did he tell you?

24        A.    He said to me it's Rafael.  I'm

25   Andres' friend.

JS

Reyes/Mateo

1      Q.    Had you ever heard that voice
2  before that day?
3      A.    Never.
4      Q.    Do you know before November 13th if
5  Andres had a friend by the name of Rafael?
6      A.    Yes.
7      Q.    Had you ever met Andres' friend
8  Rafael before November 13, 2007?
9      A.    Never.
10      Q.    Had you ever seen him before?
11      A.    Never.
12      Q.    Had you ever given someone by the
13  name of Rafael your cell phone number?
14      A.    No.
15      Q.    Did you ever ask Bryan-Estrada to
16  give Rafael your cell phone number?
17      A.    No.
18      Q.    Now, I would like you to tell us
19  what Rafael -- what else Rafael said to you
20  that day on November 13th?
21      A.    When he call me, he identified
22  himself.  I'm -- I am Rafael.  I am Andres'
23  friend.  He said hello.  He said, how are you,
24  Moraima.  I found out what had happened between
25  you and Andres, and I'm sorry about that.  I

JS

Reyes/Mateo

1   feel sad about that.  I know that he beat you
2   up.  And I hope that you guys resolve your
3   problem in a way where you don't have to be in
4   court because those charges are so strong that
5   you have mentioned, and he is aware that he
6   hurt you, and he is very remorseful.  He says
7   that he loves you.  He wants you to forgive
8   him.

9           And I responded, I am not prepared
10   to talk about this topic right now.  I am very
11   hurt and in a lot of pain physically and
12   emotionally.  And I am sorry but this is no
13   longer in my hands.

14           He continued to insist, stating,
15   you are going to get married, think things
16   better.  And nothing else.  And I said, I am
17   sorry, I no longer want to talk about this
18   situation.

19       Q.    When you indicated that Rafael
20   mentioned that you needed to find a solution,
21   did he -- did Rafael make any mention about
22   Bryan-Estrada with respect to that?  Did he
23   refer to him in any way?

24       A.    Yes.

25       Q.    How did he refer to him?

JS

Reyes/Mateo

1         A.    That he was very sorry about what

2    he had done to me, that he was not going to do

3    that again.  And I also mentioned but I -- that

4    I was in a lot of fear because when the problem

5    occurred he said if you report me to the

6    police, I am going to kill you.

7         Q.    Did Rafael respond to those

8    comments in any way?

9         A.    I said, I am sorry, but I no longer

10   want to talk about this topic.  And we ended

11   the conversation.

12        Q.    Now, did there come a time after

13   November 13th that you received another phone

14   call?

15        A.    Yes, that's how it is.

16        Q.    When was it that you received that

17   phone call?

18        A.    It was on November 25th, present

19   year.

20        Q.    That's of 2007?

21        A.    Yes.

22        Q.    And from what number did you

23   receive this phone call?

24        A.    1 646 552-5431.

25        Q.    When you say 1 646, do you really

JS

Reyes/Mateo

1       mean one and the area code of 646?

2              A.     Yes.

3              Q.     Did you recognize that number when

4       you saw it?

5              A.     No.

6              Q.     Did you in fact answer that phone

7       call when you received it?

8              A.     No.

9              Q.     And what occurred that prevented

10      you from answering that phone call.

11             A.     I had the telephone in my pocket,

12      and I was on the bus, and I did not hear when

13      the phone rang.

14             Q.     What part of Manhattan were you on

15      the bus?

16             A.     In Fort Washington on bus number

17      four.

18             Q.     Was it in the vicinity of like

19      179th Street here in Manhattan?

20             A.     179.

21             Q.     What did you do after you missed

22      that phone call?

23             A.     I missed the call.  When I arrived

24      at my friend's house, I took my phone out.  I

25      noticed that I had missed a call, the missed

Reyes/Mateo

1    call.  And I was expecting a phone call, but I

2    didn't know from which number they were going

3    to call me from.  I decided to call in order to

4    find out who it was from.

5          Q.    Around that time were you also

6    looking for a job around November 25th?

7          A.    Yes, precisely, a call from there

8    is what that I was waiting for.

9          Q.    So when you called this number

10    back, did someone answer?

11          A.    Yes.

12          Q.    Who was on the other side?

13          A.    When I called, a person responded,

14    said hello.  And I asked -- I said someone made

15    a phone call from this phone a couple of

16    minutes ago.  They said, oh, yes, it's me

17    Rafael, how are you.  I said, hello, how are

18    you.  And Mr. Rafael said to me, I am calling

19    because I -- because Andres is already free.  I

20    took him out of prison.  So I said, okay, then

21    tell me.  He said, due to the consequences of

22    the blows that he caused you --

23              (CONTINUED ON NEXT PAGE BY DC)

24

25

Reyes/Mateo

1       PEOPLE V ANDRES BRYAN-ESTRADA

2       SIXTH DEC/JAN GJ 08

3       DECEMBER 11, 2007

4       DC REL JS

5       BY MS. HUTTER:

6           A.      -- and the problems that you had

7       with Andres you have had some medical expenses

8       and he mentioned to me you don't have money and

9       you've had expenses and we are at your service

10      in order to help you with those medical

11      expenses but honestly you know -- but you

12      honestly know that those charges are too

13      strange and you should help him out.  What he

14      let me understand that was if I help him out

15      with -- in regard to these charges he could

16      help me out.  He can help me out economically.

17          Q.      When you say he, which he are you

18      referring to.  You were saying he could help me

19      out if I helped him out with the charges?

20          A.      I'm referring to Andres because

21      specifically Raphael was the vehicle of

22      communication between Andres and I.

23          Q.      So it -- is it accurate that

24      Raphael had told you in substance that Andres

25      would pay for your medical bills if you drop

                                                    DC

Reyes/Mateo

1        the charges?

2              A.     Not specifically like that.

3              Q.     But he mentioned about paying

4        your -- that Andres would pay your medical

5        bills?

6              A.     Yes.

7              Q.     And Raphael also mentioned that

8        Andres wanted you to drop the charges, correct?

9              A.     Yes, to help him in that because he

10       did not want to confront that type of problem

11       in court.  I wanna say something in regards to

12       what I understand the economical help that he

13       can offer me was.  If I withdrew the charges

14       that's what I understood to my understanding.

15             Q.     And your understanding came based

16       upon those conversations you received from

17       Raphael, correct?

18             A.     That's how it is.

19             Q.     And Raphael had definitely on the

20       first conversation indicated he's Andres'

21       friend?

22             A.     That's how it is.

23             Q.     And the cellphone number that you

24       received the second call on, is that the same

25       number as the number you received the first

DC

Reyes/Mateo

1    call on?

2            A.    It's not same number.

3            Q.    Was your number the same?

4            A.    Mine is.

5            Q.    So you received both phone calls on

6    your cellphone, the number that you gave us

7    earlier?

8            A.    That's correct, that's correct.

9            Q.    And I believe you stated that the

10    second phone call when you received the missed

11    call, was the number 646 552-5431 or 51?

12            A.    31.

13            Q.    When you called back for the missed

14    call was that the number you called too?

15            A.    That's correct.

16            Q.    Did you ever accept any money from

17    Andres?

18            A.    Never.

19            Q.    Were any of your medical bills paid

20    for by him?

21            A.    No, they have not even been paid

22    yet.

23            Q.    Did you ever make any arrangements

24    with Andres or Raphael so that could happen?

25            A.    No.

DC

36

Reyes/Mateo

1              (ADA'S CONFERS)

2              Q.    Ms. Reyes, after you receive these

3     phone calls did you report the matters to the

4     police?

5              A.    I reported it to my social worker

6     and she reported it to Officer ^ Bigchicruno.

7              Q.    And he is a police officer with the

8     New York City Police Department?

9              A.    Its a woman, she.

10             Q.    Sorry, she -- is she an officer

11    with the New York City Police Department?

12             A.    Yes, she was the one who actually

13    attended to me at the 33rd Precinct on the

14    first occasion and she has continued to follow

15    through always.

16             Q.    And I just want to ask again have

17    you ever met a friend of Andres by the name of

18    Raphael?

19             A.    I have never seen him and I have

20    not had no type of communication with him until

21    the 13th of November.

22             Q.    And there was at no point before

23    November 13th that you had given Raphael your

24    cellphone number?

25             A.    No.

                                                    DC

Reyes/Mateo

1    Q.    Before November 13th had you given

2    Andres your cellphone number?

3    A.    Of course, he was my partner.

4    MS. HUTTER:  I have no further

5    questions for this witness.

6    (CONFERS)

7    Q.    Ms. Reyes, a grand juror would like

8    to know if at any point during either

9    conversation did Raphael directly say that if

10   you drop the charges Andres will pay your

11   medical bills?

12   A.    No, not specifically.

13   Q.    But during the conversations

14   Andres -- during the conversations Raphael did

15   bring up the fact that you have medical

16   expenses, correct?

17   A.    Yes.

18   Q.    And that Andres was aware of your

19   medical expenses?

20   A.    Yes, yes.

21   Q.    And then Raphael offered that

22   Andres would pay for your medical expenses;

23   Raphael stated that he would -- that Andres

24   would pay for your medical expenses?

25   A.    That he was able to help me was the

DC

Reyes/Mateo

1    word.

2         Q.    And also during that conversation

3    Raphael asked you on Andres's behalf not to go

4    forward with the charges?

5         A.    Yes, because he did not want to

6    find himself involved in this type of

7    situation.

8              (CONFERS)

9         Q.    Ms. Reyes, a grand juror would like

10   to know about how much you have in medical

11   bills?

12        A.    Well, honestly, I do not have an

13   exact amount because I have not concluded with

14   the appointments at the doctors.  They have to

15   conduct a study on my ear and I honestly do not

16   know how much that will be.

17        Q.    Do you know how much presently

18   you've already incurred without any expectation

19   of the future expenses?

20        A.    Probably, but I have the bills

21   right here, I can show them to you.

22        Q.    Do you just have an estimate

23   number, and estimate number; is it hundred or

24   is it in the thousands?

25        A.    Four hundred and something dollars

DC

Reyes/Mateo

1      according to what I saw there, approximately.

2             Q.     If you want to take a look at your

3      receipts to see, by all means.

4             A.     Well, here it says that I must

5      bring a hundred and ninety dollars and here it

6      says that I must bring two hundred and

7      sixty-eight dollars and I do not know what else

8      or how much will they charge me on my next

9      appointment.

10            Q.     Are you able to pay either of those

11     bills at this time?

12            A.     Unfortunately not, I do not.

13            Q.     Did Andres know if you were working

14     prior to November 8, 2007?

15            A.     No, because I wasn't working.

16            Q.     So he knew you didn't have a job

17     because you lived together, right?

18            A.     Yes.

19            MS. HUTTER:    Any further questions?

20            (CONFERS)

21            Q.     Ms. Reyes, a grand juror would like

22     to know if during -- I'll take it one at a

23     time.  During the first conversation, did

24     Raphael ever say directly that he was calling

25     because Andres had asked him to call?

Reyes/Mateo

1          A.      That Andres wanted me to be called.

2    Yes, on the first occasion because he did not

3    know me.  He did not know my number.

4          Q.      What I'm asking you is not so much

5    your impression, but did -- what the grand

6    juror would like to know, did Raphael ever say

7    any words to the effect -- let me just finish

8    the question -- to the effect that I am calling

9    because Andres asked me to call?

10         A.      He called me in order -- they had

11   actually contacted each other.  He had said to

12   call me, wanted to find out how I was doing.

13         Q.      So Raphael said those things to you

14   during the first phone call?

15         A.      On the first call.

16         Q.      That Andres wanted him to find out

17   how you were doing or words to that effect?

18         A.      In order to find out what condition

19   I was and in order to resolve these things, in

20   order to resolve them.

21         Q.      On the second phone call did

22   Raphael ever say again words to the effect that

23   I am calling because Andres wanted me to call

24   you?

25         A.      No, not that I remember.  No, not

DC

Reyes/Mateo
                                                              41

1     on the second.
2              Q.    But during that second conversation
3     Raphael does mention that Andres wants to pay
4     for your medical bills?
5              A.    Yes, that he wants to help me with
6     my expenses.
7              Q.    That Raphael also indicated that
8     Andres wanted you to drop the charges?
9              A.    Not in that manner directly but
10    help him, help him.
11             Q.    In between November 13th and
12    November 25th, had you ever called Raphael?
13             A.    No.
14             Q.    Did you ever go see Andres?
15             A.    No.
16             Q.    Did you ever call Andres?
17             A.    Neither, no.
18                   (CONFERS)
19             Q.    Ms. Reyes, you indicated before
20    that when you were receiving these calls they
21    made you scared, they frightened you; is that
22    correct?
23             A.    Yes.
24             Q.    Why was it that when you heard from
25    Raphael that you were frightened?

                                                      DC

Reyes/Mateo

1    A.    Because he identified himself as

2    Andres friend and I was very scared.

3    Q.    Why would the mention of Andres

4    have frightened you over this phone call?

5    A.    Because of everything that happened

6    with that person.

7    Q.    The grand juror would like to know

8    had you mentioned death threats before?

9    A.    Yes.

10    Q.    Had you ever received any type of

11    threats like that from Andres, yes or no, and

12    that's before November 13th?

13    A.    On the day that the problem

14    occurred that if I reported him to the police.

15    I was very frightened because of that.  I was

16    not even going to report him.  I reported him

17    because the taxi that I got in that drove me to

18    the house said to me you have to report him.  I

19    did not want to report him because of the

20    revenge that he might take against me.

21        MS. HUTTER:  Okay, I'm just going

22        to also instruct the grand jury similar

23        to the instructing I gave earlier, I have

24        allowed Ms. Reyes to go into some of this

25        to give you context to how she has

Reyes/Mateo

1           received the words that she received

2           during the phone call and to give context

3           to the surrounding circumstances.

4                Again, you are not to use it as any

5           type of propensity evidence or as to any

6           other charge or uncharged crime.  It is

7           just merely as background information.

8           Q.    Ms. Reyes, a grand juror would like

9      to know if Andres had ever paid for any of your

10     expenses before November 2007?

11          A.    Medical expenses?

12          Q.    Any type of expenses.  I guess

13     rent, basic living expenses?

14          A.    Yes, we lived together.

15               (CONFERS)

16          Q.    Ms. Reyes, a grand juror would like

17     to know if in either conversation did Raphael

18     ever say that Andres wanted to get back

19     together with you, wanted to get married to you

20     still?

21          A.    In the first conversation that is

22     why he wanted to resolve these things because

23     we were going to get married this month.

24          Q.    Did you -- do you still want to get

25     married to him?

DC

44

Reyes/Mateo

1       A.    No.

2               MS. HUTTER:  I have no further

3       questions and seeing none from the grand

4       jurors, the witness is excused.  Ms.

5       Reyes, you can step outside.

6               (WITNESS & INTERPRETER EXCUSED)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DC

1     MS. HUTTER:  I will be back in one

2   moment.

3     (ADA HUTTER, GAFFNEY AND GRAND JURY

4   REPORTER LEAVE GRAND JURY CHAMBER AND

5   RETURN SHORTLY THEREAFTER)

6     MS. HUTTER:  Good afternoon ladies

7   and gentlemen.  My name is still Barbara

8   Hutter.  I am back here after your break

9   continuing on the Andres Bryan-Estrada.

10     At this time instead of Ms. Gaffney

11   being in the grand jury we do have Coleen

12   Balbert, who is also an Assistant

13   District Attorney here in New York

14   County.

15     At this time the defendant has

16   chosen his right to exercise -- to

17   exercise his right to testify before the

18   grand jury.  Before that occurs I need to

19   give you some instruction with regard to

20   defendant testifying in the grand jury.

21   Before the defendant testifies I need to

22   tell you the following:

23     The defendant will have his

24   attorney Douglas Lyons with him.  That is

25   his right.  During the defendant's

1    appearance he may confer with his

2    attorney.  Do not draw any information

3    from this whatsoever.  If the defendant

4    confers with his attorney I may make a

5    note of it on the record and similarly

6    you are not to draw any inference from

7    this whatsoever.

8        However, the defense attorney's

9    role is only to advise his client.  The

10   defense attorney may not participate in

11   the proceedings in any other matter.  The

12   defendant must also subscribe and execute

13   a Waiver of Immunity before he testifies.

14   Again, you must not draw any inference

15   from this.

16       I will also tell you that the

17   defendant will be testifying through an

18   interpreter and we are having a different

19   interpreter for the defendant's

20   testimony, who is also not appeared to my

21   understanding before this grand jury.

22       So at this time I am go to bring

23   Juan Carlos Perez into the grand jury to

24   qualify him or expect to qualify him as

25   an interpreter.

DC

Perez

1           J U A N          C A R L O S    P E R E Z,

2                    called to act as interpreter,

3                    states as follows:

4                         THE FOREPERSON:  Do you solemnly

5                    swear that the answers to the questions

6                    to be administered as to your

7                    qualifications shall be the truth, so

8                    help you God?

9                         THE WITNESS:  Yes, I do.

10     BY MS. HUTTER:

11           Q.      You can have a seat please.  What

12     is your name for the record?

13           A.      Juan Carlos Perez.

14           Q.      And for whom are you employed?

15           A.      I work independently.

16           Q.      Do you at times work for the New

17     York County District Attorney's Office?

18           A.      Yes, I do.

19           Q.      And for about how long do you come

20     here as an independent contractor, as an

21     interpreter?

22           A.      I come frequently.

23           Q.      Do you come more than once a week?

24           A.      Yes.

25           Q.      And for about how many years have

DC

Perez

1    you been coming to the New York County District

2    Attorney's Office to do interpretations?

3         A.    About three years.

4         Q.    Besides coming to New York County

5    District Attorney's Office, what other work do

6    you do with respect to interpretation?

7         A.    I work in the filed of foreign

8    languages for about twenty-four years.

9         Q.    And what type of educational

10   experience have you had with respect to

11   translation or the English or Spanish language?

12        A.    I studied from very early age

13   English in Mexico um, I came to the U.S. when I

14   was around twenty-two years old, so yeah.

15        Q.    Do you have any type of college

16   degree?

17        A.    I -- yes, I do.

18        Q.    What is that in?

19        A.    I studied Bachelor of Arts majoring

20   in French philosophy.  I studied also science

21   engineering.  I am currently studying biology.

22        Q.    Are you fluent in the English

23   language?

24        A.    Yes, I am.

25        Q.    Are you fluent in the Spanish

DC

Perez

1    language.

2           A.    I -- yes.

3           Q.    Sorry, where did you grow up, what

4    country?

5           A.    Mexico.

6           Q.    Have you been trained in the

7    translation from English to Spanish and Spanish

8    to English

9           A.    Yes, I have.

10          Q.    Besides what you have already

11   spoken about is there anything else in your

12   background and training with respect to that,

13   with respect to the translation?

14          A.    Well, I have done so many different

15   things in twenty-four years.

16          Q.    Have you previously been qualified

17   grand juries of New York County to serve as an

18   expert in the translation of English to Spanish

19   and Spanish to English?

20          A.    Yes, I have.

21          Q.    About how many times have you been

22   qualified?

23          A.    Many times, I don't remember.

24          Q.    Is it more than twenty?

25          A.    More than one hundred I think.

DC

Perez

1          MS. HUTTER:  At this time I hereby

2     qualify Mr. Juan Carlos Perez in the

3     translation of  English to Spanish and

4     Spanish to English.  I ask that he be

5     sworn in.

6          THE FOREPERSON:  Do you solemnly

7     swear that whenever you shall appear

8     before this grand jury to interpret the

9     testimony given by any witness here you

10    will truthfully and faithfully interpret

11    the testimony of the witness, that you

12    will keep secret all matters before such

13    grand jury within your knowledge, so help

14    you God?

15          THE WITNESS:  Yes, I do.

16

17

18

19

20

21

22

23

24

25

DC

Bryan-Estrada/Perez

1  A N D R E S         E S T R A D A-B R Y A N,
2              called as a witness, accompanied by
3              attorney, Douglas Lyons, Esq., through
4              the interpreter, Juan Carlos Perez,
5              stated as follows:
6  BY MS. HUTTER:
7       Q.    Mr. Andres Bryan-Estrada, can you
8  please state your full name and address for the
9  record?
10      A.    Andres Estrada-Bryan.
11      Q.    What is your address?
12      A.    625 West 156th Street.
13      Q.    Is Mr. Douglas Lyons who is seated
14 to your right your attorney?
15      A.    Yes.
16      Q.    Before you on the table is a
17 document entitled Waiver of Immunity marked
18 Grand Jury Exhibit Number 4 for identification.
19 Have you read Grand Jury Exhibit Number 4 for
20 identification today prior to coming to the
21 grand jury chamber?
22      A.    With a gentlemen, yes.
23      Q.    With Mr. Lyons present you mean?
24      A.    Lyons -- one second please.  Lyons,
25 thank you.

                                        DC

Bryan-Estrada/Perez

1      Q.     Does Grand Jury Exhibit Number 4

2   have your signature on the bottom of the page

3   or in the middle of the page?

4      A.     Yes.

5      Q.     Have you conferred with your

6   attorney for the purpose of deciding whether

7   you will swear to the Waiver of Immunity and

8   testify before the grand jury?

9      A.     Yes.

10      Q.     Do you wish to have any more time

11   to consult with your attorney?

12      A.     No.

13      Q.     Mr. Andres Estrada-Bryan, do you

14   understand that although you are appearing

15   before this grand jury as a witness the grand

16   jury may charge you with the commission of a

17   crime or crimes based upon your testimony and

18   other evidence before the grand jury?

19      A.     I did not understand that.

20      Q.     I will repeat that.  Do you

21   understand that although you are appearing

22   before this grand jury as a witness the grand

23   jury may charge you with the commission of a

24   crime or crimes based upon your testimony and

25   other evidence before the grand jury?

DC

Bryan-Estrada/Perez

1        A.      I have not committed any crime.

2        Q.      That's not the question, sir.  I

3    need to ask you this question and I need an

4    answer to the question that I'm asking.  You

5    will have an opportunity after you -- we go

6    through all these questions to speak to the

7    grand jurors.

8            The question before you now at

9    this time, do you understand that although you

10   are appearing before this grand jury as a

11   witness the grand jury may charge you with the

12   commission of a crime or crimes based upon your

13   testimony and other evidence before the Grand

14   Jury?

15       A.      Yes, I do understand.

16       Q.      Do you understand that your

17   testimony before this grand jury may be used

18   against you in this and other proceedings?

19       A.      Yes, I do understand.

20       Q.      Do you understand that you have the

21   right to refuse to answer and be sworn before

22   this grand jury and to refuse to give any

23   testimony whatsoever that might tend to

24   incriminate you?

25       A.      Yes, I do understand.

DC

Bryan-Estrada/Perez

1      Q.    Do you now wish to swear to this

2   Waiver of Immunity and testify before the grand

3   jury?

4      A.    Yes, I do.

5      Q.    Do you do so voluntarily?

6      A.    Yes.

7      Q.    Has anyone forced you or coerced

8   you in any way to sign, swear to or execute

9   this waiver?

10      A.    No.

11      Q.    Has any promise been made to you by

12   anyone in connection with you signing, swearing

13   to or executing this waiver?

14      A.    No.

15      Q.    If you wish to waive immunity and

16   testify please stand and raise your right hand

17   so the foreperson can swear you to the waiver.

18           THE FOREPERSON:  Do you solemnly

19           swear that you have read the document

20           Exhibit Number 4 entitled Waiver of

21           Immunity, that you understand it, that

22           you have signed it, that the statements

23           made by you therein are true, so help you

24           God?

25           THE WITNESS:  Yes, I do.

DC

55

Bryan-Estrada/Perez

1          MS. HUTTER:  I now offer Grand Jury

2     Exhibit Number 4 for identification in

3     evidence and ask -- I ask that the

4     witness be sworn in.

5          THE WARDEN:  Okay, sir, stand up,

6     raise your right hand again.

7          THE FOREPERSON:  Do you solemnly

8     swear that the evidence you give to this

9     grand jury upon this complaint against

10    Andres Bryan-Estrada shall be the truth,

11    the whole truth, nothing but the truth,

12    so help you God?

13          THE WITNESS:  Yes, I do.

14  BY MS. HUTTER:

15     Q.    You may have a seat, sir.  The

16  grand jury is investigating two incidents,

17  which -- one which occurred on November 13,

18  2007.  One which occurred on November 25, 2007.

19  Do you have an statement that you wish to make

20  with respect to those incidents?

21     A.    Please repeat, I did not understand

22  what you said.

23     Q.    Sure.  Sir, the grand jury is

24  investigating two incidents, one which occurred

25  on November 13, 2007 and one which occurred on

DC

Bryan-Estrada/Perez

1    November 25, 2007, do you have a statement that
2    you wish to make with regard to those
3    incidents?
4            A.    Yes.
5            Q.    Okay, you may make your statement
6    now?
7            A.    Do you want to know about what
8    happened first from the beginning.
9            Q.    It is your statement, sir.   I
10   cannot tell you what you should or should not
11   say?
12           A.    At no time I have given permission
13   to anyone so that anyone makes a phone call on
14   behalf of me, at no time.   I have not used any
15   phone from here in order to make a phone call
16   to anyone, nobody.   No contact has called my
17   friend and has asked him to contact the lady.
18   I'm not bothering her.   I have not bothered
19   her.   I'm a hard working person who has no
20   problem with anyone.   I'm not trying to get
21   into trouble with any person around me either.
22           Nothing has been offered to her not
23   to be -- asked that she should drop any charges
24   or anything to that nature.   I have not even
25   her either.   Since this incident took place I

DC

Bryan-Estrada/Perez

1    have not seen her, bother her and I have been

2    in my work.  I haven't asked anybody else to

3    call anybody either and if the gentlemen -- if

4    he did call her he did use his phone and did

5    not use my phone.  I have not given permission

6    to him to call anybody either.  She claims that

7    Raphael, Mr. Raphael was the one who called her

8    and talk to her.

9          Q.    Is that the conclusion of your

10   statement?

11         A.    Yes.

12         Q.    Sir, I have some questions for you.

13   Do you know a man by the name of Raphael?

14         A.    Yes, I do.

15         Q.    In fact, Raphael is a friend of

16   yours?

17         A.    Yes.

18         Q.    And what's Raphael's last name?

19         A.    Ramirez.

20         Q.    How long have you known Raphael

21   Ramirez?

22         A.    Five or four years.

23         Q.    How did you come to meet Raphael?

24         A.    Not recently.  He lives in one

25   place, I live at a different place.

DC

Bryan-Estrada/Perez

1    Q.    How did you first meet him?

2    A.    First time I met him working as an

3    assistant.

4    Q.    Were you his assistant, was he your

5    boss?

6    A.    I was working, I was assisting

7    somebody else, he was a co-worker I met him.

8    Q.    Kind of work do you?

9    A.    Assist constructing.

10   Q.    Now, you know a woman by the name

11   of Moraima Reyes, correct?

12   A.    Yes, she was my girlfriend.

13   Q.    In fact, the two of you were going

14   to get married, correct?

15   A.    Yes.

16   Q.    And you in fact lived together this

17   year at different points?

18   A.    For eight months.

19   Q.    And you know that presently there

20   is one criminal matter pending against you,

21   correct?

22   A.    Yes, I do understand.

23   Q.    I'm not talking about the matter we

24   are asking the grand jurors to consider today?

25   A.    Okay, I do understand.

DC

Bryan-Estrada/Perez

1          A.     Nobody has done that either.

2                 MS. HUTTER:   Jut for the record

3          counsel is conferring with his client.

4          Q.     Sir, as part of that have order of

5   protection you were told you could not contact

6   Ms. Reyes through a third party, correct?

7          A.     Yes.

8          Q.     I need you to give a verbal answer.

9          A.     Yes.

10         Q.     And then again you appeared in

11  court on November 15, 2007?

12         A.     Is it 15 today?

13         Q.     No, today is December 11th.   I'm

14  talking about November 15th, a few days after

15  the first court date on the other matter you

16  came back to court, correct?

17         A.     Yes.

18         Q.     And at that time another order of

19  protection was issued, correct?

20         A.     As far as I know it wasn't issued.

21         Q.     It was just an extension of the

22  original order?

23         A.     Yes, an extension, yes.

24         Q.     And the judge told you you still

25  had to abide by the original order or words to

                                            DC

Bryan-Estrada/Perez

1      that effect?

2              A.     Yes.

3              Q.     Again you are told not to contact

4      Ms. Reyes through a third party?

5              A.     Yes.

6              Q.     Now, you're saying or you told this

7      grand jury that you have not given anyone

8      permission to talk to Ms. Reyes, right?

9              A.     Yes.

10             Q.     And you have not wanted anyone to

11     talk to her?

12             A.     Yes.

13             Q.     But your friend Raphael did call

14     her?

15             A.     I don't know whether he did or not.

16             Q.     You don't know if -- Raphael never

17     mentioned to you that he spoke to Ms. Reyes?

18             A.     No, because I have not seen Raphael

19     for a long time.  I learned that when I was

20     arrested.

21             Q.     Really, have you notice -- is it

22     your testimony that you have not seen Mr. Reyes

23     since November 10, 2007?

24             A.     That's not his name.

25             Q.     I'm sorry, your friend Raphael?

DC

Bryan-Estrada/Perez

1          A.     We just -- he and myself, he got
2     out -- me out of the jail.
3          Q.     So you did see him at some point?
4          A.     At that time I did, yes.
5          Q.     In fact there was a point where you
6     were in custody for a short period of time,
7     correct?
8          A.     Before that first incident I was
9     detained.
10         Q.     And Raphael Ramirez came to visit
11    you in fact?
12         A.     He came to visit me once.
13         Q.     And that was on November 14th of
14    2007?
15         A.     I don't remember, it may have been.
16         Q.     Let me show you a document that I
17    had deemed People's Exhibit Number or Grand
18    Jury Exhibit Number 5.  If you would like to
19    take a look at that to see if it refreshes your
20    memory?
21         A.     Yes.
22         Q.     Upon looking at that document, does
23    it refresh your memory as to when Mr. Ramirez
24    came to visit me?
25         A.     Yes, on that day he visited me.

                                             DC

Bryan-Estrada/Perez

1      Q.     In fact he came to visit you on

2   November 14, 2007, correct?

3      A.     Yes, but I don't remember the days

4   because I was incarcerated.  I had been

5   detained.

6      Q.     But that's the day after one of the

7   days this grand jury is investigating; isn't

8   that correct?

9      A.     No, no, no.

10     Q.     They're investigating a matter that

11  happened on November 13th, so the date after

12  November 14th, is the day after, correct, when

13  Mr. ^ 147 Rivera showed up?

14     A.     Yes.

15     Q.     What did you and Mr. Rivera talk

16  about when he came and visit you?

17     A.     Nothing, just normal talk as we

18  talk like friends.

19     Q.     You had no conversation about Ms.

20  Reyes?

21     A.     At no time.

22     Q.     Raphael didn't mention that the day

23  before he had spoken to her?

24     A.     No, he has not said anything to me.

25     Q.     He didn't mention to you at all on

DC

Bryan-Estrada/Perez

1    that time that he visited you that he -- you

2    were to give her money.

3              A.    At no time.

4              Q.    Let me ask you this, before he came

5    to visit you did you ever speak to Mr. Ramirez

6    on the phone?

7              A.    I always talk to him because he's

8    my friend.    I always call him.

9              Q.    His phone number is 646 552-5431?

10             A.    That's correct.

11             Q.    And would it be accurate to say

12   that you spoke to him several times on November

13   11, 2007?

14             A.    Everyday.    I was incarcerated, I

15   was calling him.

16             Q.    So you spoke to him everyday?

17             A.    Every time I got a chance to call.

18             Q.    Because he's a good friend of yours

19   right?

20             A.    In the U.S. he's the only friend I

21   have.    I don't have family, I don't have

22   anybody.

23             Q.    So he's someone you rely on,

24   correct?

25             A.    He's my friend, yes.

                                              DC

Bryan-Estrada/Perez

1          Q.      And he helps you out, correct, or

2    has in the past?

3          A.      He got me out, he helped me by

4    paying the bail.

5          Q.      You're telling me while you are

6    incarcerated for it was about nine days,

7    correct?

8          A.      Yes.

9          Q.      During those nine days you spoke to

10   him every single day?

11         A.      Every time I got a chance to.

12         Q.      During that same time you now that

13   there were various charges that Ms. Reyes was

14   saying about you, just yes or no?

15         A.      Yes.

16         Q.      Because I am not trying to ask you

17   about that incident, I want to be clear about

18   that, okay.  So you knew that there were

19   serious charges being brought by her against

20   you?

21         A.      She did, yes.

22         Q.      You speak to Mr. Ramirez every

23   single day?

24         A.      Every time I got a chance to talk

25   to Raphael I did.

DC

Bryan-Estrada/Perez

```
1          Q.     You want this grand jury to believe
2     that you never once had a conversation about
3     Ms. Reyes?
4          A.     No, because he she also knows him
5     prior to this.
6          Q.     She does, how does she know him?
7          A.     Through me, I introduce them when
8     she was with me.
9          Q.     When did you introduce them?
10         A.     When we met long time ago.
11         Q.     But he's still really your friend,
12    not her friend?
13         A.     He's a friend of mine, yes.
14         Q.     He's not a -- really a friend of
15    hers?
16         A.     But they know each other.
17         Q.     You have Ms. Reyes' cellphone
18    number, correct?
19         A.     She has a pre-paid phone, she
20    frequently has a change of phone so.
21         Q.     Back in November, early in November
22    11th through the 20th, you knew what her
23    cellphone number was, correct?
24         A.     Yes, she has always had different
25    numbers but I have not ever called her in order
```

DC

68

Bryan-Estrada/Perez

1      Q.    On November 8th she is still living

2    with you, correct?

3      A.    November 8th she lived with me.

4    However, I had been out of state, I had just

5    come back about three days prior to that and

6    she did not give me the number.  She would only

7    give me the number if she wanted to.

8      Q.    But how would you have known if she

9    had a different number if she didn't give it to

10   you?

11     A.    When I would leave she would call

12   me but she would not use her own phone.  She

13   would go to a phone service to make a phone

14   call to me.

15     Q.    So what you're trying to tell these

16   grand jurors is that prior to November 8th your

17   fiance -- she was your fiance at that time,

18   right.  I need you to give an answer.  She was

19   your fiance at that time?

20     A.    Yes, for eight months.

21     Q.    On November 8th your fiance -- what

22   you want the grand jury to believe is you

23   didn't have her cellphone number?

24     A.    I don't have her phone number.  If

25   she call me I got it on the caller Id, I would

DC

Bryan-Estrada/Perez

1   then have it but otherwise I wouldn't have it.

2        Q.   So you accepted the fact that your

3   fiance didn't give you her number?

4        A.   She did not give the number to me

5   and if she called me she would do that from her

6   friend's, female friend's houses so I couldn't

7   have those numbers either.  There were too many

8   numbers for me to keep track.  It would have

9   been insane for me to keep track of all those

10   numbers.

11        Q.   It sounds like what your telling us

12   is that she changed her number everyday?

13        A.   I'm not saying that she changed

14   phone everyday.  When she wanted to give it to

15   me she did.  When she didn't want to she did

16   not because I was working out of the city.

17        Q.   You loved her back on November 8th,

18   right?

19        A.   I have always loved her.  I have

20   never stopped loving her.

21        Q.   You planned to marry her?

22        A.   We were to get married.

23        Q.   You lived with her?

24        A.   For eight months.  I brought her

25   from Santo Domingo, I paid for her expenses to

DC

70

Bryan-Estrada/Perez

1    come here as well to my room.

2         Q.    And yet you accepted the fact from

3    what your telling us is that she wouldn't give

4    you her cellphone number?

5         A.    From the time she arrived here she

6    started immediately changing her ways and she

7    was influenced by church.

8         Q.    Now, your friend Raphael got her

9    number because he called her?

10        A.    She called him.

11        Q.    She called him?

12        A.    Amongst the numbers she had was his

13   phone and she had his phone number.

14        Q.    How do you know that?

15        A.    Once he told me that.

16        Q.    Told that you and when was that?

17        A.    Long time ago.

18        Q.    So a long time ago she had his

19   number, is what you're telling me?

20        A.    Yes.

21        Q.    And so somehow out of that what you

22   believe is that he got her number?

23        A.    Yes, because his phone number is

24   listed.

25        Q.    But it doesn't explain how he would

DC

Bryan-Estrada/Perez

1    have her present number on November 13th?

2            A.      That I don't know.

3            Q.      Because what you're telling us is

4    she changed her number all the time?

5            A.      Sometimes she changed the number.

6    If she calls me, Mr. Raphael, and she gives her

7    phone number to him that's her will, that's her

8    phone number and she will give to anyone she

9    wants to give it to.

10           Q.      That whole time in mid November

11   when you're talking to Raphael between like

12   November 11th and November 25th, when you're

13   talking to and seeing Raphael.

14           A.      Yes.

15           Q.      You and he never talk about her?

16           A.      I did not talk anything about her.

17   I didn't have to.

18                   (CONTINUED ON NEXT PAGE BY JS)

19

20

21

22

23

24

25

                                                    DC

Bryan-Estrada/Perez

1    PEO. V. ANDRES BRYAN-ESTRADA

2    SIXTH DEC/JAN 2008 GJ

3    DECEMBER 11, 2007

4    JS REL DC

5    BY MS. HUTTER:

6         Q.    And during that time, what you are

7    telling us is you didn't know her number?  You

8    didn't know Miss Reyes' number?

9         A.    I don't have her phone number, and

10   I don't have it at this present time yet.  At

11   times she has called me and that's why at times

12   her phone number has appeared, but I cannot

13   know her number.

14        Q.    Yet Rafael seemed to have gotten

15   her phone number?

16        A.    One of the phone numbers she gave

17   to him it is possible that he called her.

18        Q.    So he somehow obtains her number,

19   your one and only friend here in the United

20   States?

21        A.    Because they know each other.  They

22   are friends.  They know each other for some

23   time.  Because she knows we're friends, she

24   will call him or he would call her.  We're

25   friends.

JS

Bryan-Estrada/Perez

1        Q.    She is not better friends with
2   Rafael than you are, right?
3        A.    But she knows he is my friend.
4        Q.    But you are better friends with
5   Rafael than Miss Reyes is?
6        A.    Miss Reyes was a lady who was with
7   me.
8        Q.    Answer my question.  My question
9   is:  You were better friends with Rafael, in
10  fact much better friends than Miss Reyes was?
11       A.    No, he is friends as well.  She
12  knows he is my friend then.
13       Q.    He is your close friend?
14       A.    He is my friend.
15            MS. HUTTER:  At this time I'm going
16       to stop my questioning to see if the
17       grand jurors wish to ask any questions of
18       Mr. Estrada.
19            (CONFERS)
20       Q.    Mr. Estrada, a grand juror would
21  like to know what your financial situation is?
22       A.    I work as a construction assistant.
23       Q.    Do you have an apartment that you
24  rent?
25       A.    A room.

JS

Bryan-Estrada/Perez

74

1        Q.    A room.   Okay.   You receive a

2    salary as part of that job?

3        A.    Yes.

4        Q.    I am sorry?

5        A.    Due to my job, yes.

6        Q.    In the past, prior to November 8th,

7    you helped to support Miss Reyes, correct?

8        A.    I have always helped her.   At times

9    I have helped her.

10       Q.    You have the financial means to

11   help her?

12       A.    Not always.

13       Q.    But you have had it in the past?

14       A.    Almost always.   Many times I have

15   helped her.

16       Q.    The grand jurors would like to

17   know, in mid November what your -- did you have

18   the means to support Miss Reyes?

19       A.    No, because at that time she was

20   doing many things.   I think she was with many

21   men who lived around there, and I was not

22   supporting her at that time.

23       Q.    You --

24       A.    Then she had to go work on her own.

25       Q.    'Cause you didn't think very much

JS

Bryan-Estrada/Perez

1    of her at that point, did you?

2          A.    Once she arrived here she started

3    changing dramatically.  At that point what she

4    wanted was only money.  And she mentioned to me

5    that she was at that time offering her buttocks

6    to whoever she wanted.  That they were her

7    buttocks.  That I had no right to question what

8    she did with them.  Two, three a.m. many men

9    came looking for her, picking her up.  She

10   would leave at that time with different men.

11   She did this multiple times.

12         Q.    When was this?

13         A.    When.  That was once she came back

14   from Santa Domingo up to the 8th.  Once I was

15   working in Delaware, I came back, I saw her.  I

16   -- I came back.  I -- when I came back, the

17   owner of the apartment was there, and I heard

18   the door making a noise.  And I said, I think I

19   heard someone going out.

20              THE INTERPRETER:  I am sorry, I

21         need to clarify something.

22         A.    I saw her coming out of the bedroom

23   of an apartment of a neighbor.  He is not the

24   owner of the apartment.  He rents that room.

25         Q.    So what you are saying is that you

JS

Bryan-Estrada/Perez

1   lived and loved with a whore?

2                    INTERPRETER:  I didn't hear you.  I

3          am sorry.

4          Q.    I think he heard my question.  You

5   lived and loved with a whore, right?  That's

6   what you are telling us?

7          A.    I didn't know she was that way

8   because only when she changing I realized that.

9                    MS. HUTTER:  Okay.  Any other

10         questions from the grand jurors?

11         I see no further questions from the grand

12         jurors.

13         A.    Many times when she came back the

14   day after she had money.  She was counting

15   money she had.  She brought money with her.

16   She would go to all the bars around.

17         Q.    Okay.  Sir, if it relates to the

18   incident that the grand jury -- if it relates

19   to the incident, what you want to say to the

20   incident of November 13th or November 25th you

21   can continue with what you are going to say but

22   otherwise my questioning has ended.

23         A.    All those facts are related.

24         Q.    You already discussed her character

25   or your impression of her character.

                                                    JS

Bryan-Estrada/Perez

1          A.    Prior to this I have also spoken

2    about her character, yes.

3          Q.    You wish to say anything else about

4    November 13th or November 25th?

5          A.    Regarding November 25th what I can

6    do is that -- I did not -- I am not -- I am --

7    I did not give authorization to anybody.   I

8    don't know either anything regarding any

9    problem.   I have not violated any Order of

10   Protection at all.   I am incarcerated at the

11   present time.   I am innocent.

12              MS. HUTTER:   Okay.   Thank you, sir.

13              THE WARDEN:   Okay, sir.

14              (WITNESS, INTERPRETER AND ATTORNEY

15        EXCUSED EXCUSED)

16

17

18

19

20

21

22

23

24

25

                                                    JS

BAIL RECEIPT AND NOTICE TO PERSON POSTING BAIL

№ 955363

| Date Bail $ Received (Today's Date) | Time Bail $ Received |
|---|---|
| 3-12-2008 | 1545 |

Indictment # 6241 2007 Docket #U 2007 Y0913 98

Defendant's Name (Last, First and M.I.) People v. BRYAN-ESTRADA-Andres

NYSID # 4 9 3 5 2 0 0 2 3 4 9 0 7 2 2 3 8 0

Offense(s) PL 215.00

| Name of Judge/Justice Who Set Bail | County | Court | Part |
|---|---|---|---|
| Wiley | NY | Supreme | 42 |

| Last Court Date Bail Was Set | Bail Amount (Numerical) | Bail Amount (Written) |
|---|---|---|
| 3-5-2008 | $ 7500.00 | Seven Thousand Five Hundred DOLLAR(S) |

Check One: Cash ☒

Check or Money Order ☒ (if check(s) or money order(s), enter number(s) and name(s) of issuing organization(s)) Capital One NA ck # 8020198431

Describe any outstanding warrants or detainers, including surety examination, prohibiting defendant's immediate discharge. If none, write "NONE". NONE 2007NY085216

Having posted the bail amount listed above, and having read the information on the back of Copy 1 concerning bail refunds, and having been notified of any outstanding warrants or detainers prohibiting the immediate discharge of the defendant, I undertake that the defendant will appear in this action whenever required & will at all times render himself/herself amenable to the orders and processes of the court, and I acknowledge that the bail will be forfeited if the defendant does not comply with any requirement or order of process to appear in this action, and that his/her next scheduled court appearance is at 9:30 A.M. on the date and place written below:

| Date of Next Court Appearance | County | Court | Part |
|---|---|---|---|
| 4-9-2008 | NY | Supreme | 42 |

OBTAIN SIGNATURE OF PERSON POSTING BAIL ON COPIES 2, 3, 4, & 5

Name of Person Posting Bail (Printed) Rafael Ramirez

Occupation of Person Posting Bail Retired

Residential Address of Person Posting Bail (including ZIP Code) 175 Irving Avenue Apt #1 Bklyn NY 11232

| Signature of Employee Receiving Bail $ | Title | Shield or ID # | Facility Recv'g Bail $ | Facility Housing Inmate |
|---|---|---|---|---|
| fox Martins | BC | 38101 | MDC | GMDC |

Rita Ramirez

### Distribution & Routing Instructions

No. 1 Give to person posting bail. Bail funds are deposited not later than the next business day after their receipt. Checks for refund of bail, minus the Department of Finance three percent 3% fee will be mailed according to the notice on the back of this form from the DIRECTOR OF FINANCE OF THE CITY OF NEW YORK, Room 2200, Municipal Building, 1 Centre Street, New York, NY 10007. The three percent 3% fee will not be subtracted if the case is terminated at the trial level with a dismissal or acquittal.

COPY 1

34 R (4/91)





DEPARTMENT OF CORRECTION
MANHATTAN-DETENTION COMPLEX
125 WHITE STREET
NEW YORK, N.Y. 10013

955363

▲  PAYEE ENDORSEMENT AREA  ▲
▼  THIS AREA FOR BANK USE ONLY ▼

In order to make a claim for payment of a cashier's check which has been lost, destroyed, or stolen, you must either be the remitter of the check (the person who purchased it from Capital One National Association), or the payee (the person to whom the cashier's check is made payable) and you must complete an "Affidavit of Lost, Destroyed or Stolen Cashier's Check" (available at any banking office) before a notary public and give it to Capital One National Association. Please note that your claim is not effective until the 90th calendar day following the date of the cashier's check or the date the affidavit is received by Capital One National Association, whichever is later. Even if your claim has been received by Capital One National Association, the Bank can pay the check prior to the effective date of your claim to any person entitled to enforce it. In the event your claim becomes effective and is honored, you may be liable for the amount of the check should it subsequently be paid to a person having the rights of a holder in due course.

* FEDERAL BANKING ACT 1987 - FEDERAL RESERVE REG. CC

PAGd
DE 2

X



SPARTAN
BAIL BONDS

N.Y.C.

ANTHONY ASHBY
AGENCY CUSTODY ENFORCEMENT &
COMPLIANCE SUPERVISOR

TEL (800) 583-2245
FAX (212) 577-7780
81 BAXTER STREET
NEW YORK, NY 10013
WWW.SPARTANBAILBONDS.COM

Ck#:352, Amt:$5,160.00, Date:11/20/2007

352

ANDRES BRYAN
175 SWAB AVE., APT 4
BROOKLYN, NY 11224

Date _____

Pay to the
Order of _____ $ 5,160⁰⁰

Five Thousand one HUNDRED sixty ⁰⁰/₁₀₀ Dollars

North Fork Bank

For _____

Carlos E. Foster

⑈021407913⑈⑈6508⑈0048⑈3⑈ 0352

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY
100 CENTRE STREET
NEW YORK, NY 10013

FEE: $10.00

CERTIFICATE OF DISPOSITION - BAIL EXONERATION

CERTIFICATE OF DISPOSITION NUMBER: 21383

DATE: 01/23/2008

PEOPLE OF THE STATE OF NEW YORK
                              VS.

CASE NUMBER:                     05863-2007
LOWER COURT NUMBER(S):           2007NY085216
DATE OF ARREST:                  11/10/2007
ARREST #:                        M07697417
DATE OF BIRTH:                   07/02/1959
DATE FILED:                      11/30/2007

BRYANESTRADA, ANDRES

        DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 12/20/2007 IN PART AA70 BEFORE JUDGE
CARRUTHERS, R THE BOND IN THE AMOUNT OF $10,000 WAS EXONERATED.

SURETY NAME:        FAIRMONT SPECIALTY
SURETY ADDRESS:     P.O. BOX 2807

DATE POSTED:        11/30/2007

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 01/23/2008.

                                        COURT CLERK



# EXCEPTION HOLD NOTICE

**Depositor Name:** ANDRES BRYAN

**Depositor Address:** 1614 BEDFORD AVE APT 1C
BROOKLYN NY 11225

| | |
|---|---|
| **Account Number:** 7142457010 | **Date of Notice:** 05/25/2010 |
| **Amount of Deposit:** $8,240.00 | **Date of Deposit:** 05/25/2010 |

We are delaying the availability of **$3,140.00** from this deposit. These funds will be available on the **Seventh** business day after the day of your deposit.

The reason we are doing this is:

- ☐ A check you deposited was previously returned unpaid.
- ☐ You have overdrawn your account repeatedly in the last six months.
- ☒ The checks you deposited on this day exceed $5,000.
- ☐ An emergency, such as failure of communications or computer equipment, has occurred.

We believe the check may be uncollectible for the following reason(s):

- ☐ We received notice that the check is being returned unpaid.
- ☐ The check is drawn on an account with repeated overdrafts.
- ☐ We are unable to verify the endorsement of a joint payee.
- ☐ Some information on the check is not consistent with other information on the check.
- ☐ There are erasures or other apparent alterations on the check.
- ☐ The routing number of the paying bank is not a current routing number.
- ☐ The check is postdated or has a stale date.
- ☐ Information from the paying bank indicates that the check may not be paid.
- ☐ We have been notified that the check has been lost or damaged in collection.
- ☐ Other: _____
  _____

**Please note that you are responsible for these funds even if you have withdrawn them from your account.**

If you did not receive this notice at the time you made the deposit and the check you deposited is paid, we will refund to you any fees charged by Capital One Bank for overdrafts or returned checks that result solely from the additional delay that we are imposing. To obtain a refund of such fees, please contact the customer service representative at your branch of account.

Provided: ☐ in person
☐ by mail on _____

## CUSTOMER COPY

| | | |
|---|---|---|
| DATE RECEIVED: 05/25/2010 | TIME RECEIVED: 2:31:02 PM | USER ID: MHE472 |

Products and services offered by Capital One, N.A., Member FDIC. Capital One Bank is a trade name of Capital One, N.A., and does not refer to a separately insured institution.

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY
100 CENTRE STREET
NEW YORK, NY 10013

FEE:$10.00

CERTIFICATE OF DISPOSITION DISMISSAL

DATE: 03/16/2010                          CERTIFICATE OF DISPOSITION NUMBER: 31505

PEOPLE OF THE STATE OF NEW YORK                CASE NUMBER:              05863-2007
                                               LOWER COURT NUMBER(S):    2007NY085216
VS.                                            DATE OF ARREST:           11/10/2007
                                               ARREST #:                 M076974I7
                                               DATE OF BIRTH:            07/02/1959
BRYANESTRADA, ANDRES                           DATE FILED:               11/30/2007

DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 02/17/2010 THE ABOVE ACTION WAS
DISMISSED AND ALL PENDING CRIMINAL CHARGES RELATED TO
THIS ACTION WERE ALSO DISMISSED BY THE HONORABLE WILEY,M    THEN
A JUDGE OF THIS COURT.

THE DEFENDANT WAS DISCHARGED FROM THE JURISDICTION OF THE COURT.

THE ABOVE MENTIONED DISMISSAL IS A TERMINATION OF THE CRIMINAL
ACTION IN FAVOR OF THE ACCUSED AND PURSUANT TO SECTION 160.60 OF
THE CRIMINAL PROCEDURE LAW "THE ARREST AND PROSECUTION SHALL BE
DEEMED A NULLITY AND THE ACCUSED SHALL BE RESTORED, IN
CONTEMPLATION OF LAW, TO THE STATUS OCCUPIED BEFORE THE ARREST
AND PROSECUTION".

IN WITNESS WHEREOF,I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 03/16/2010.

_____
COURT CLERK

SUPREME COURT OF THE STATE OF NEW YORK        FEE:$10.00
NEW YORK COUNTY
100 CENTRE STREET
NEW YORK, NY 10013

CERTIFICATE OF DISPOSITION DISMISSAL

DATE: 03/16/2010                     CERTIFICATE OF DISPOSITION NUMBER: 31504

PEOPLE OF THE STATE OF NEW YORK          CASE NUMBER:              06241-2007
                VS.                      LOWER COURT NUMBER(S):    2007NY091398
                                         DATE OF ARREST:           12/06/2007
                                         ARREST #:                 M07704717
                                         DATE OF BIRTH:            07/02/1959
BRYANESTRADA,ANDRES                      DATE FILED:               12/24/2007

_____
            DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 02/17/2010 THE ABOVE ACTION WAS
DISMISSED AND ALL PENDING CRIMINAL CHARGES RELATED TO
THIS ACTION WERE ALSO DISMISSED BY THE HONORABLE  WILEY,M   THEN
A JUDGE OF THIS COURT.

THE DEFENDANT WAS DISCHARGED FROM THE JURISDICTION OF THE COURT.

THE ABOVE MENTIONED DISMISSAL IS A TERMINATION OF THE CRIMINAL
ACTION IN FAVOR OF THE ACCUSED AND PURSUANT TO SECTION 160.60 OF
THE CRIMINAL PROCEDURE LAW "THE ARREST AND PROSECUTION SHALL BE
DEEMED A NULLITY AND THE ACCUSED SHALL BE RESTORED, IN
CONTEMPLATION OF LAW, TO THE STATUS OCCUPIED BEFORE THE ARREST
AND PROSECUTION".

IN WITNESS WHEREOF,I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 03/16/2010.

_____
                COURT CLERK



# EXCEPTION HOLD NOTICE

Depositor Name:    ANDRES BRYAN

Depositor Address:    1614 BEDFORD AVE APT 1C
BROOKLYN NY 11225

Account Number:    6606009873    Date of Notice:    05/25/2010

Amount of Deposit:    $7,500.00    Date of Deposit:    05/25/2010

We are delaying the availability of _____ $2,400.00 _____ from this deposit. These funds will be available on the _____ Seventh _____ business day after the day of your deposit.

The reason we are doing this is:

☐ A check you deposited was previously returned unpaid.
☐ You have overdrawn your account repeatedly in the last six months.
☒ The checks you deposited on this day exceed $5,000.
☐ An emergency, such as failure of communications or computer equipment, has occurred.

We believe the check may be uncollectible for the following reason(s):

☐ We received notice that the check is being returned unpaid.
☐ The check is drawn on an account with repeated overdrafts.
☐ We are unable to verify the endorsement of a joint payee.
☐ Some information on the check is not consistent with other information on the check.
☐ There are erasures or other apparent alterations on the check.
☐ The routing number of the paying bank is not a current routing number.
☐ The check is postdated or has a stale date.
☐ Information from the paying bank indicates that the check may not be paid.
☐ We have been notified that the check has been lost or damaged in collection.
☐ Other: _____

Please note that you are responsible for these funds even if you have withdrawn them from your account.

If you did not receive this notice at the time you made the deposit and the check you deposited is paid, we will refund to you any fees charged by Capital One Bank for overdrafts or returned checks that result solely from the additional delay that we are imposing. To obtain a refund of such fees, please contact the customer service representative at your branch of account.

Provided:    ☐ in person
☐ by mail on _____

## CUSTOMER COPY

DATE RECEIVED: 05/25/2010    TIME RECEIVED: 2:30:27 PM    USER ID: MHE472

100-3911 (7/09)  2-7171038

Products and services offered by Capital One, N.A., Member FDIC. Capital One Bank is a trade name of Capital One, N.A., and does not refer to a separately insured institution.

Page 1 of 2

DEPARTMENT of FINANCE · BUREAU of TREASURY
COMMON TRUST DISBURSEMENT ACCOUNT

62-35
311

| IN THE MATTER OF | PEOPLE VS BRYAN-ESTRADA | DATE | MAY 17, 2010 | 098985 | 98985 |

• PAY   $****7,500 DOLLARS   00 CENTS

PAY TO THE ORDER OF

ANDRES BRYAN
1614 BEDFORD AVENUE, APT#1C
BROOKLYN NY                    11225

PURSUANT TO ORDER DATED

SUPREME COURT
FEB 17, 2010

BL-N-1344452

COMMISSIONER of FINANCE

BANK OF NEW YORK (DELAWARE)
NEWARK, DE 19711

THIS CHECK MUST BE ENDORSED BY THE PAYEE AS DRAWN AND NEGOTIATED PROMPTLY

⑆00098985⑆ ⑈031100351⑈ ⑆0300958584⑆

---

RAFAEL RAMIREZ
176 IRVING AVE APT 1
BROOKLYN, NY 11237

1010
56-791/214

5/24/10  Date

Pay to the Order of   ANDRES BRYAN                    $ 8240.00

EIGHT THOUSAND TWO HUNDRED FORTY and 00/100   Dollars

Capital One Bank
Capital One, N.A.

for RETURN OF BAIL COLLATERAL

⑈021407912⑈701 22 349741⑈ 1010

130 Livingston Street                     Howard H. Roberts, Jr.
Brooklyn, NY 11201                        President

 **New York City Transit**

June 23, 2009

Arthur S. Friedman, Esq.

275 Madison Avenue

New York,      NY  10016

Re:  Freedom of Information Law
     Request No.   14261

Dear Mr. Friedman:

This is in response to your Freedom of Information Law Request, wherein you requested
a print-out of your client's, Mr. Bryanestrada, metrocard for November 7, 8 and 9 of 2007.

As this response is less than four pages, NYCT has elected to waive its fee.

I hope this satisfies your request.

Sincerely,

Gail Rogers
Deputy Foil Officer

MTA New York City Transit is an agency of the Metropolitan Transportation Authority, State of New York
H. Dale Hemmerdinger, Chairman                    Elliot G. Sander, Executive Director and CEO

58-01-5505 11/07

RUN DATE: 06/22/2009
RUN TIME: 10:11:18

NEW YORK CITY TRANSIT AUTHORITY
FARECARD HISTORY BY SERIAL NUMBER(S)
START DATE: 11/05/07 - END DATE: 11/10/07
WITHOUT TBC MISSWIPES

PGM: TRFCB145
PAGE #: 1

| FARECARD # | DATE | TIME | RIDE CNT | TRANSACTION TYPE | TRANSACTION AMOUNT | LOCATION/ BUS/ROUTE | BCOTR | REMAINING VALUE | FARECARD TYPE | POE/LOC | EXCDR | SCP/ DEPOT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1605961650 | 11/06/2007 | 19:41 | 000 | SALE(VALUE) AT AN AVM | $20.00 | 170 ST | N208 | $24.00 | FULL FARE | 1767 | 5991 | 010700 |
| 1605961650 | 11/06/2007 | 19:42 | 000 | BONUS VALUE AT AVM | $4.00 | 170 ST | N208 | $34.00 | FULL FARE | 1767 | 5991 | 010700 |
| 1605961650 | 11/06/2007 | 19:48 | 001 | VALUE DEDUCT USAGE AT AF | $3.00 | 170 ST | N208 | $22.00 | FULL FARE | 1767 | 5991 | 010000 |
| 1605961650 | 11/06/2007 | 20:00 | 001 | XFER AT IFU | $0.00 | 7797/BX6 | 2 | $22.00 | FULL FARE | 0120 | 5991 | 20 |
| 1605961650 | 11/07/2007 | 08:12 | 002 | VALUE DEDUCT USAGE AT IF | $2.00 | 7797/BX6 | 2 | $20.00 | FULL FARE | 0120 | 5991 | 20 |
| 1605961650 | 11/07/2007 | 08:24 | 092 | XFER AT AFC GATE | $0.00 | 161 ST-YANKEE | R262 | $20.00 | FULL FARE | 1971 | 5991 | 030302 |
| 1605961650 | 11/07/2007 | 08:54 | 003 | VALUE DEDUCT USAGE AT AF | $2.00 | BEDFORD PARK B | R251 | $18.00 | FULL FARE | 1982 | 5991 | 000001 |
| 1605961650 | 11/07/2007 | 18:54 | 004 | VALUE DEDUCT USAGE AT AF | $2.00 | 170 ST | N208 | $16.00 | FULL FARE | 1767 | 5991 | 010002 |
| 1605961650 | 11/07/2007 | 19:18 | 004 | XFER AT IFU | $0.00 | 7797/BX6 | 2 | $16.00 | FULL FARE | 0119 | 5991 | 20 |
| 1605961650 | 11/08/2007 | 09:36 | 005 | VALUE DEDUCT USAGE AT IF | $2.00 | 664/BX6 | 2 | $14.00 | FULL FARE | 0120 | 5991 | 20 |
| 1605961650 | 11/08/2007 | 09:48 | 005 | XFER AT AFC GATE | $0.00 | 161 ST-YANKEE | N203 | $14.00 | FULL FARE | 1767 | 5991 | 000003 |
| 1605961650 | 11/08/2007 | 18:42 | 006 | VALUE DEDUCT USAGE AT AF | $2.00 | 170 ST | N208 | $12.00 | FULL FARE | 1767 | 5991 | 010002 |
| 1605961650 | 11/08/2007 | 18:54 | 006 | XFER AT IFU | $0.00 | 402/BX6 | 2 | $12.00 | FULL FARE | 0120 | 5991 | 20 |
| 1605961650 | 11/08/2007 | 08:24 | 007 | VALUE DEDUCT USAGE AT IF | $2.00 | 7725/BX6 | 2 | $10.00 | FULL FARE | 0120 | 5991 | 20 |
| 1605961650 | 11/09/2007 | 08:36 | 007 | XFER AT AFC GATE | $0.00 | 161 ST-YANKEE | N203 | $10.00 | FULL FARE | 1767 | 5991 | 000003 |
| 1605961650 | 11/09/2007 | 18:06 | 008 | VALUE DEDUCT USAGE AT AF | $2.00 | 170 ST | N208 | $8.00 | FULL FARE | 1767 | 5991 | 010002 |
| 1605961650 | 11/09/2007 | 18:24 | 008 | XFER AT IFU | $0.00 | 6296/BX6 | 2 | $8.00 | FULL FARE | 0119 | 5991 | 20 |

Page 1

Office of District Attorney of New York
Spanish Language Unit
People vs. Andres Bryan Estrada, Docket# 2007NY091398
Translated for ADA Matt Galluzo
Transcribed and Translated by Yudelca Mateo

---

FC: Female Caller
MC: Male Caller
Underlined words were originally spoken in English
U/I: Unintelligible

---

[Telephone Ringing]

MC: Hello…

FC:   Sí…hello… ¿cómo estás Rafael?
      **Yes…hello… how are you Rafael?**

MC: Oh…un momento…ajá…
     **Oh…one moment…aha…**

FC:   Sí…¿sabe quién le habla?
      **Yes…do you know who is speaking?**

MC: No…

FC:   Es Moraima…
      **It's Moraima…**

MC: Oh, Moraima… ¿Cómo estás mi amor?
     **Oh, Moraima…how are you my dear?**

FC:   Un poquito apenada porque me enteré que rearrestaron a Andrés…y
      no estaba en mis planes eso…
      **A little sad because I found out they rearrested Andres…and that
      was not in my plans….**

MC:  Pero mi hija, si él me dijo, que tú fuiste a…denunciarlo otra vez…
      **But my dear, if he told me, that you went to…report him again…**

1

FC: No, no, no, realmente ya yo no quiero ningún tipo de problema y te estoy llamando porque me siento apenada y realmente quería hablar contigo...
**No, no, no, honestly I don't want any type of problem and I am calling you because I feel sad and honestly I wanted to talk to you...**

MC: Fíjate yo...todo esto me a sorprendido...pero yo dije esta muchachita tan  buena que suena por teléfono... tan buena persona y ahora viene... porque yo...tú no sabe lo que yo oí...
**Look I... all of this has surprised me...but I said this young lady, she sounds so nice over the telephone...such a nice person and now she comes... because I...you do not know what I heard...**

FC:    Tú sabe...
**You know...**

MC: Yo oí más...
**I heard more...**

FC: Perdón...
**Pardon me...**

MC: Dime...
**Tell me...**

FC: No, tú sabes que ese es un proceso que no esta en mis manos, ya realmente no depende de mi lo que haga la justicia, y tú tienes que entender eso.
**No, you know that this is a process that is out of my hands, honestly now it is not up to me what the justice system does, and you have to understand that.**

MC: Umh...pues, eso depende...yo no se, porque fíjate pues, si no tienes interés la fiscalía no puede perseguir lo, ellos pueden si quieren, lo mas probable que no...hay gente, Moraima...yo te digo una cosa como te dije anteriormente...
**Umh...well, that depends...I don't know, because look, well, if you have no interest, the District Attorney's Office can not pursue it, they can if they want to, most probably no...there are people,**